UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

VENETIA KAPERNEKAS                  :   08-CV-4046 (JSR)
                                    :
                        Plaintiff,  :   **FIRST AMENDED COMPLAINT**
                                    :
      -against-                     :
                                    :   **JURY TRIAL DEMANDED**
UDO FRITZ-HERMANN BRANDHORST        :
                                    :
                        Defendant.  :
_____:

RECEIVED
08 JUN 25 PM 9:38
U.S. DISTRICT COURT
S.D.N.Y.

Plaintiff, by her attorneys, brings this first amended complaint for damages and equitable relief against the defendant, and demanding trial by jury, complains and alleges as follows:

### THE PARTIES

1. Plaintiff, Venetia Kapernekas ("plaintiff" or "Kapernekas"), is an adult individual residing at 104 Wooster Street, 3 N, New York, NY 10012.

2. Defendant, Udo Fritz-Hermann Brandhorst ("defendant" or "Brandhorst"), is a German citizen and resident of Bavaria, Germany, with a residence located at Hittostrasse 20, Hitterkirchen Bernau 83233, Bavaria.

### JURISDICTION AND VENUE

3. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because this is a civil action between a party who is a citizen of a State and a citizen of a foreign state, and the matter in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to this litigation occurred here.

## MATERIAL FACTS

5. Kapernekas is the sole proprietor of a contemporary art gallery located at 526 W 26 Street, Suite 814, New York, New York 10001.

6. Brandhorst is a highly successful investor and an international collector of fine contemporary art (*i.e.,* he purchases contemporary art by established prominent artists such as Cy Twombley, Damien Hirst and Andy Warhol, from art dealers such as the Gagosian Gallery).

7. Brandhorst is also a founder and the president of an entity called the Brandhorst Foundation, a Bavarian public, not-for-profit foundation that funds the purchase of certain artwork for the Brandhorst Collection. The State of Bavaria, Germany is currently building a major art museum in Munich to house the Brandhorst Collection.

8. Kapernekas first met Brandhorst in November, 1997 in Cologne, Germany while she was running a major cutting edge contemporary art gallery in Athens, Greece (Icebox) and entered into a personal relationship with him.

9. Kapernekas became pregnant with Brandhorst's twins in late 1998. At the request of Brandhorst, Kapernekas underwent a medical procedure to terminate the twin pregnancy in January, 1999.

10. In the Fall of 1999, for reasons partially related to the medical procedure, as well as to assist Kapernekas with her art career, Brandhorst gave Kapernekas a gift of $1,000,000.00 by depositing that sum in her Swiss Bank Account No. 16 622.***.** at the Bank of Basel ("the

2

Kapernekas Account"). Brandhorst wired the money from an account that he controlled in Luxembourg.

11. The Kapernekas Account had been opened by Kapernekas prior to the gift from Brandhorst; she had opened the Kapernekas Account in or around June, 1998, when she received a payment (approximately $10,000.00) in Swiss Francs from a Swiss art collector.

12. Kapernekas is the sole person named on the Kapernekas Account and the Kapernekas Account remains open today.

13. At one point Kapernekas executed a power of attorney in favor of Brandhorst so that he could assist her in making investment decisions. Kapernekas withdrew the power of attorney on or about March 8, 2002.

14. In 2001, Kapernekas became pregnant again with Brandhorst's child.

15. Kapernekas gave birth to Brandhorst's only daughter, AN[1], in October, 2001.

16. During that time-period (and currently) Kapernekas and AN lived in a loft apartment owned by Brandhorst and located at 104 Wooster Street, New York, 3N.

17. Kapernekas initially planned to invest the $1,000,000.00 gift from Brandhorst in real estate in Manhattan and explained this to Brandhorst as well as to bank officials assisting her with the account.

18. Brandhorst responded that Kapernekas should instead invest the money in art by an established contemporary artist because she would yield a greater return on her investment.

19. In the late Spring of 2002, Brandhorst offered to purchase fine contemporary art from Kapernekas.

---

[1] AN is a minor child whose identity is known to the parties.

3

20.     Kapernekas was aware of the fact that Brandhorst was a successful investor, particularly as an expert in purchasing, investing and collecting contemporary art by prominent artists, the prices for which were escalating rapidly at the time.

21.     Kapernekas also knew that Brandhorst (unlike Kapernekas) had access to fine art dealers and had the ability to negotiate lower prices when purchasing contemporary art from prominent artists, due in part to the type and amount of art he purchased, as well as the fact that he often purchased art on behalf of his prestigious Brandhorst Foundation for the Brandhorst Collection.

22.     Kapernekas agreed to provide Brandhorst with her funds to invest in contemporary art on her behalf at the Gagosian Gallery, located in Manhattan, New York. Kapernekas and Brandhorst understood and agreed that Brandhorst would safeguard the art for an unspecified duration until such time as it could be sold for significantly more than the purchase price. Kapernekas knew that Brandhorst would not want to sell the artwork for at least 4-5 years, because collectors such as Brandhorst do not "churn" artwork.

23.     Kapernekas also knew that art purchased from the Gagosian Gallery by Brandhorst would be from an established contemporary artist, in part because she had researched the types of pieces being shown and sold by the Gagosian Gallery at the time.

24.     Kapernekas relied upon Brandhorst's expertise in deciding to permit him to use her funds to invest on her behalf in the fine art market and she hoped to obtain a substantial return on her investment.

25.     In July, 2002, at the express request of Brandhorst, Kapernekas transferred $825,416.83 (hereafter "the funds") from the Kapernekas Account directly to an account

managed by Chase Bank on behalf of the Gagosian Gallery, located in Manhattan, New York. The sole purpose of this transfer was to permit Brandhorst to purchase contemporary art at the Gagosian Gallery as an investment for Kapernekas.

26. Brandhorst used the funds to purchase contemporary artwork from the Gagosian Gallery in New York.

27. After purchasing the artwork, Brandhorst assured Kapenekas that it was a good investment.

28. Kapernekas did not immediately request that Brandhorst identify the artwork because, due to their personal relationship and his expertise, she trusted him and did not suspect or have reason to suspect that Brandhorst would try to claim ownership rights over the art. Kapernekas also knew that investors such as Brandhorst typically keep art purchases confidential for a period of at least 5 to 7 years depending upon the artwork and the market.

29. When Kapernekas did periodically inquire about the identity of the artwork at a later date Brandhorst told her not to worry about it and she continued to trust him for these same reasons.

30. In 2004, Kapernekas sought to obtain sole custody of AN by filing custody and support petitions in New York's Family Court. (Kapernekas withdrew the petitions within a few months due to pressure from Brandhorst).

31. After the petitions were filed, Brandhorst continued to pay $20,000.00 per month in child support and Kapernekas and his daughter continued to reside at 104 Wooster Street, 3N.

32. At no time prior to February, 2007 did Brandhorst expressly or impliedly suggest to Kapernekas that he was asserting ownership of the artwork.

5

33. In January 2007, Kapernekas decided that she was no longer interested in tying her funds up in the artwork, and was ready to realize the value of her investment. Contemporary art of the type selected and purchased by Brandhorst from the Gagosian Gallery in New York had greatly increased in value over the last 5 – 8 years.

34. On or around February 2, 2007, Kapernekas, through her attorneys, made a demand for the artwork during a meeting with an attorney at the Blank Rome firm who represented Brandhorst. Brandhorst's attorney did not confirm the identity of the artwork and the ownership interest of Kapernekas in the art.

35. After additional efforts proved futile, Kapernekas commenced this lawsuit against Brandhorst and the Brandhorst Foundation on April 29, 2008 seeking to recover the art or the proceeds from its sale. At the time Kapernekas did not know for certain the identity of the artwork but concluded the artwork must have so greatly increased in value that Brandhorst no longer wanted to surrender it or permit her to share in the proceeds of its sale.

36. Kapernekas named the Brandhorst Foundation as a defendant in her original complaint because Brandhorst had stated to her and the news media that all of "his" artwork had been transferred to the Brandhorst Foundation and she reasonably concluded the Brandhorst Foundation might assert a claim of ownership over the art.

37. On June 11, 2008, Brandhorst and the Brandhorst Foundation filed a motion to dismiss the complaint.

38. Brandhorst and the Brandhorst Foundation stated in their motion papers (which included a sworn declaration from Brandhorst) that Brandhorst claims sole title to the art and the

6

Foundation does not assert any ownership interest over the art. For that reason this first amended complaint is directed only to Brandhorst.

39.     Brandhorst attached "Invoice 02252 Revised" from the Gagosian Gallery as an exhibit to his sworn declaration in support of the motion to dismiss.

40.     "Invoice 02252 Revised" shows that the funds from Kapernekas were used by Brandhorst to partially pay for two pieces by renowned contemporary artist Damien Hirst: A painted bronze statute titled *Hymn* and a mixed media piece titled *Pill Cabinet*. (A true and correct copy of the "Invoice 02252 Revised" proffered by Brandhorst is annexed to this first amended complaint as Exhibit "A").

41.     The invoice evidences that the total purchase price for the two pieces was $3,000,000.00.

42.     The invoice does not state the price for each piece and, therefore, Kapernekas does not know whether her funds were used to purchase one of the two pieces or whether she has an ownership interest in both pieces.

43.     The invoice reflects that $825,785.00 of the total purchase price was to be paid by a wire from the Kapernekas Account ("Basler Kantonalbank").

44.     Brandhorst's sworn declaration in support of the motion to dismiss contains multiple additional exhibits including wire instructions signed by Kapernekas that show the wire from the Kapernekas Account to the Chase Bank Account on or about July 1, 2002 and references "Invoice 02252". (A true and correct copy of the July 1, 2002 wire instructions with a more recent translation are annexed hereto as Exhibit "B").

## Count I

### (Replevin)

45. Plaintiff repeats and realleges the allegations in the preceding paragraphs of the first amended complaint as if fully set forth at length herein.

46. Kapernekas is the rightful owner of contemporary art that was purchased using the funds that she wired to the Gagosian Gallery in New York at the request of Brandhorst.

47. Upon information and belief, and based upon "Invoice 02252 Revised" proffered by Brandhorst, the art owned by Kapernekas is either *Hymn* or *Pill Cabinet*. Alternatively, Kapernekas may possess ownership rights in both pieces.

48. On or about February 2, 2007 Kapernekas demanded the art and Brandhorst refused to surrender the art to Kapernekas.

49. Kapernekas commenced this lawsuit approximately 13 months after she demanded the art from Brandhorst and he refused to identify or surrender it.

50. The art is valuable and unique and should be immediately returned to Kapernekas.

51. The right of Kapernekas to possess the art is superior to any right claimed by Brandhorst because the art was purchased on behalf of Kapernekas using the funds that she wired to the Gagosian Gallery in New York.

## Count II

(Conversion)

52. Plaintiff repeats and realleges the allegations in the preceding paragraphs of the first amended complaint as if fully set forth at length herein.

53. The parties understood and agreed that Brandhorst would purchase contemporary art on behalf of Kapernekas as an investment.

54. Brandhorst did in fact purchase contemporary art on behalf of Kapernekas as an investment.

55. Despite demand, Brandhorst has refused to surrender the art to Kapernekas.

56. Brandhorst has converted property belonging to Kapernekas, and his refusal to return the property to Kapernekas in February, 2007 was unlawful and gives rise to this claim for conversion.

57. Kapernekas is entitled to damages against Brandhorst measured by the current market value of the art, all in an amount to be determined at trial but in no event less than $825,416.83, plus costs, interest, and attorney's fees.

## Count III

(Breach of Fiduciary Duty)

58. Plaintiff repeats and realleges the allegations in the preceding paragraphs of the first amended complaint as if fully set forth at length herein.

59. Brandhorst offered to invest the funds in contemporary art and Kapernekas accepted the offer.

60. Kapernekas entrusted Brandhorst with the funds for investment purposes and Brandhorst used the funds to invest in contemporary art.

61. In offering to invest, and subsequently investing the funds, Brandhorst undertook a duty of good faith and loyalty to Kapernekas.

62. Brandhorst's failure and refusal to identify the art and surrender it to Kapernekas upon demand constitutes a breach of the duties of good faith and loyalty owed to Kapernekas.

63. As a result of Brandhorst's breach of his duties, Kapernekas is entitled to equitable relief (a constructive trust or whatever else this court deems just and proper) or damages against Brandhorst measured by the current market value of the art, all in an amount to be determined at trial but in no event less than $825,416.83, plus costs, interest, and attorney's fees.

## Count IV

(Breach of Contract – Bailment of Infinite Duration)

64. Plaintiff repeats and realleges the allegations in the preceding paragraphs of the first amended complaint as if fully set forth at length herein.

65. Kapernekas agreed to transfer funds to the Gagosian Gallery and Brandhorst agreed to purchase and safeguard contemporary art for her for an infinite duration.

66. Brandhorst purchased contemporary art from the Gagosian Gallery on behalf of Kapernekas and took possession of the art as a bailor.

67. In February, 2007 Brandhorst suggested for the first time that he was asserting sole ownership over the artwork when despite Kapernekas' demand for its return, he refused to identify or surrender it.

68.     Brandhorst's refusal to identify and surrender the art to plaintiff constitutes a breach of a bailment of infinite duration.

69.     Kapernekas is entitled to damages against Brandhorst measured by the current market value of the art, all in an amount to be determined at trial but in no event less than $825,416.83, plus costs, interest, and attorney's fees.

## Count V

(Unjust Enrichment)

70.     Plaintiff repeats and realleges the allegations in the preceding paragraphs of the first amended complaint as if fully set forth at length herein.

71.     At the request of Brandhorst, Kapernekas transmitted the funds to the Gagosian Gallery in New York and Brandhorst used the funds to invest in contemporary art on behalf of Kapernekas.

72.     Brandhorst appreciated, accepted and retained the benefit of the art and his wrongful refusal to surrender the art to plaintiff, or to permit Kapernekas to share in the proceeds from a sale of the art, has unjustly enriched Brandhorst at the expense of Kapernekas.

73.     Retention of the art by Brandhorst without payment to Kapernekas would be unjust.

74.     Kapernekas is entitled to equitable relief (in the form of a constructive trust or whatever this Court deems just and proper) or damages against Brandhorst measured by the current market value of the art, all in an amount to be determined at trial but in no event less than $825,416.83, plus costs, interest, and attorney's fees.

## Count VI

(Constructive Trust)

75. Plaintiff repeats and realleges the allegations in the preceding paragraphs of the first amended complaint as if fully set forth at length herein.

76. At all relevant times hereto, Kapernekas and Brandhorst had a confidential or fiduciary relationship.

77. Brandhorst promised to invest Kapernekas' funds in contemporary art, and to return to her at an unspecified date the return on her investment.

78. In reliance upon this promise, Kapernekas transferred the funds to the Gagosian Gallery for Brandhorst to purchase and take possession of the artwork.

79. Brandhorst has refused to surrender the art or return to her the appreciated value of her investment, and has been unjustly enriched at the expense of Kapernekas.

80. Kapernekas is entitled to a constructive trust in the amount of the benefit she has conferred on Brandhorst as a result of her purchase and his bailment of the subject art, plus costs, interest, and attorney's fees.

**WHEREFORE** plaintiff Venetia Kapernekas prays for the following equitable and monetary relief:

(a) Order defendant to identify the current location of the art and surrender title to the art to plaintiff

(b) Enjoin defendant from taking any action that would diminish the value of the art

(c) Order defendant to pay damages in an amount to be determined at trial but in no event less than $825,416.83, plus costs, interest, and attorney's fees.

(d) Order defendant to pay the costs of this action

(e) Grant plaintiff such other equitable relief as is just and proper under the circumstances.

FOX ROTHSCHILD, LLP

John A. Wait, Esq. (JW 2558)
100 Park Avenue, 15th Floor
New York, NY 10017
Tel: (212) 878-7900
Fax: (212) 692-0940

OF COUNSEL:
Robert E. Goldman
FOX ROTHSCHILD LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103
*ATTORNEYS FOR PLAINTIFF:*
**VENETIA KAPERNEKAS**

# GAGOSIAN GALLERY

May 7, 2002                                         Invoice 02252
                                                    Revised

Mr Udo Brandhorst
Haydnstrasse 15
50935 Koln-Lindenthal
GERMANY

INVOICE
―――――――――

DAMIEN HIRST
*Hymn*, 2000
Painted Bronze
240 x 108 x 48 inches (609.6 x 274.3 x 121.9 cm)

DAMIEN HIRST
*(Untitled)* Pill Cabinet, 2002
Mixed media
27 x 8 feet (8.2 x 2.4 meter)

TOTAL AMOUNT DUE:                    $3,000,000.00
                                     ============

Wire information: Chase Bank
                  475 West 23rd Street
                  New York, NY  10011
                   ABA # 021 000 021
                  Account Name: Gagosian Gallery, Inc.
                  Account Number: ███████

*Title does not pass until payment in full has been received.*

Überweisung durch Herrn Zimmer veranlaßt: 12.06.02       2,175.000,-- $
Basler Kantonalbank:                                       825.785,-- $

980 MADISON AVENUE  NEW YORK  NY  10021  T. 212.744.2313  F. 212.772.7962
INFO@GAGOSIAN.COM  WWW.GAGOSIAN.COM

FROM : VENETIA KAPERNEKAS          FAX NO. :129254448          Jun. 23 2004 09:39AM P3

**Venetia Kapernekas**
104 Wooster Street, 3N
New York, N.Y. 10012
U.S.A.

Basler Kantonalbank
Bereich Privatkunden
z. H Herrn Willi Harr
Postfach
CH - 4002 Basel

1. Juli 2002

**Treuhandanlage**
**Stand per** ~~...~~

Sehr geehrter Herr Harr,

*DEN GESAMTEN DOLLAR BETRAG*

Ich bitte Sie um sofortige Schließung meiner Treuhandanlage. Bitte überweisen Sie das Guthaben wie folgt:

**Empfänger:**    Gagosian Gallery
980 Madison Avenue
New York, NY 10021 / USA

**Bankverbindung:**    Chase Bank
475 West 23rd Street
New York, NY 10011 / USA
ABA # ~~...~~
Account Name: Gagosian Gallery, Inc.
Account Number: ~~...~~

**Betreff:**    Invoice 02252

Bitte geben Sie vorab

Herrn Udo Brandhorst, Haydnstr. 15, D-50935 Köln
Fax: (+49) 221 - 467 1112

den genauen Betrag bekannt, der zur Auszahlung gelangt.

Mit freundlichen Grüßen

*[signature]*
Venetia Kapernekas

**Venetia Kapernekas**
104 Wooster Street, 3N
New York, NY 10012
U.S.A.

Basler Kantonalbank
Area Private Clients
Attn: Mr. Willi Harr
P.O. Box
CH-4002 Basel

July 1, 2002

**Trust Account**
**Status as of 5/31/2002: $825,416.83 US**

Dear Mr. Harr,

Please close my trust account at once. Please transfer[1] the balance as follows:

| | |
|---|---|
| Recipient: | Gagosian Gallery
980 Madison Avenue
New York, NY 10021 / USA |
| Bank Connection: | Chase Bank[2]
475 West 23rd Street
New York, NY 10011 / USA
ABA # ▓▓▓▓▓▓▓
Account Name: Gagosian Gallery, Inc.
Account Number: ▓▓▓▓▓▓▓ |
| Re: | Invoice 02252 |

Please initially apprise

        Mr. Udo Brandhorst, Haydnstr. 15, D-50935 Cologne
        Fax: (+49) 221 - 467 - 1112

of the precise amount that is paid.

With kind regards
[SIGNATURE]
Venetia Kapernekas

---

[1] [Above "transfer" hand-written notation] *the entire dollar amount*
[2] [Stamp placed over bank information illegible]



**LEGAL LANGUAGE SERVICES**

An affiliate of ALS International
18 John Street
Suite 300
New York, NY 10038

Telephone (212) 766-4111
Toll Free (800) 788-0450
Telefax (212) 349-0964
www.legallanguage.com

June 10, 2008

To whom it may concern:

This is to certify that the attached translation from German into English is an accurate representation of the document received by this office. This document is designated as:

*Investment Documents*

George Alves, Manager of Translation Services of this company, certifies that Andrew Dyck, who translated this document, is fluent in German and standard North American English and is qualified to translate.

He attests to the following:

"To the best of my knowledge, the accompanying text is a true, full and accurate translation of the specified document."

Signature of George Alves

Subscribed and sworn to before me this 10th day of June, 2008

Rosemary Diaz
Notary Public, State of New York
No. 01DI6077317
Certificate filed in New York County
Qualified in Kings County
Commission Expires July 8, 2010

Sincerely,

Victor J. Hertz
President & CEO