WITHERS BERGMAN LLP
Hollis Gonerka Bart (HB-8955)
Chaya Weinberg-Brodt (CW-4676)
430 Park Avenue, 10th floor
New York, New York 10022
212.848.9800 (p)
212.848.9888 (f)
*Attorneys for Udo Fritz-Hermann Brandhorst*
*and The Brandhorst Foundation*

**REDACTED**

**For Public Filing**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
VENETIA KAPERNEKAS,

                   Plaintiff,

       -against-

UDO FRITZ-HERMANN BRANDHORST
and THE BRANDHORST FOUNDATION

               Defendants.

-----------------------------------------------------------x

No. 08-CV-4046 (JSR)

### MEMORANDUM OF LAW OF DEFENDANTS
### UDO FRITZ-HERMANN BRANDHORST AND THE BRANDHORST FOUNDATION
### <u>IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT</u>

## TABLE OF CONTENTS

Page

Table of Authorities ....................................................................................................... iii

Preliminary Statement ..................................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

A.   The Relationship between Ms. Kapernekas and Mr. Brandhorst ........................... 2

B.   The Brandhorst Foundation ................................................................................... 5

C.   The Allegations of the Complaint ......................................................................... 6

ARGUMENT ................................................................................................................... 7

POINT I ALL OF PLAINTIFF'S CLAIMS ARE BARRED BY THE STATUTE OF
LIMITATIONS AND BY LACHES ................................................................................ 7

A.   All of Plaintiff's Claims are Untimely .................................................................. 7

B.   Plaintiff Cannot Use Artful Pleading to Evade the Statute  of Limitations
for her Replevin and Conversion Claims ............................................................... 9

POINT II THE COURT HAS NO PERSONAL JURISDICTION OVER THE BRANDHORST
FOUNDATION .............................................................................................................. 13

A.   The Foundation is Not Subject to General Jurisdiction Under CPLR § 301 ......... 14

B.   CPLR § 302 Does Not Confer Jurisdiction .......................................................... 15

      1.   The Foundation Transacted No Business in  New York State Related
      to this Dispute .................................................................................................. 15

      2.   The Foundation Committed No Tortious Act in New York Related
      to this Dispute .................................................................................................. 16

      3.   The Foundation is Not Subject to Jurisdiction under CLPR §
      302(a)(3) .......................................................................................................... 17

POINT III ALTERNATIVELY, THE FOUNDATION IS IMMUNE FROM SUIT IN THIS
COURT PURSUANT TO THE FOREIGN SOVEREIGN IMMUNITIES ACT ....................... 18

A.   The Foundation was Created For a National Purpose ........................................... 19

B.   The Bavarian Government Actively Supervises the Foundation ........................... 20

C.   Public Employees ................................................................................................. 22

D.   The Foundation Holds Exclusive Rights in the State of Bavaria .......................... 22

i

E.    The Foundation is Treated as an "Organ" of the Bavarian Government ............................22

POINT IV THE COMPLAINT CONTAINS NO FACTUAL ALLEGATIONS AGAINST THE
BRANDHORST FOUNDATION, AND THEREFORE FAILS TO STATE A CLAIM
AGAINST IT ...................................................................................................................................... 24

Conclusion ............................................................................................................................................ 25

687554-7

## Table of Authorities

**Cases**

*Antares Aircraft, L.P. v. Fed. Republic of Nigeria*, 999 F.2d 33 (2d Cir. 2003) .......................... 23

*Aschenbrenner v. Conseil regional de Haute-Normandie,* 851 F. Supp. 580 (S.D.N.Y. 1994).. 20, 23

*ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) .................. 3

*Batsidis v. Batsidis*, 9 A.D.3d 342, 343 (2d Dep't 2004) ............................................................ 24

*Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955 (2007) .............................................................. 10

*Close-Barzin v. Christie's Inc.*, 2008 WL 1946724, *1 (1st Dep't May 6, 2008)........................ 12

*Diesel Sys., Ltd. v. Yip Shing Diesel Eng. Co., Ltd.*, 861 F. Supp. 179 (E.D.N.Y. 1994) ............ 14

*Fagan v. Comanche Inv., LLC*, 2006 U.S. Dist. LEXIS 66065, *15 (S.D.N.Y. 2006) ................ 25

*Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384 (S.D.N.Y. 2001) ................................ 4

*Filler v. Hanvit Bank*, 378 F.3d 213 (2d Cir. 2004)..................................................................... 19

*Gold Sun Shipping Ltd. v. Ionian Transp. Inc.,* 245 A.D.2d 420 (2d Dep't 1997).................... 7, 8

Grynberg v. ENI S.p.A, 2007 US Dist. LEXIS 65787, *9 (S.D.N.Y. September 5, 2007......... 8, 9

*Haviland v. J. Aron & Co.,* 796 F. Supp. 95, 97 (S.D.N.Y. 1992) ................................................. 6

*Herrington v. Verrilli,* 151 F. Supp.2d 449 (S.D.N.Y. 2001)................................................... 9, 10

*In re Peters,* 34 A.D.3d 29 (1st Dep't 2006) ................................................................................ 8

*Indyk v. Habib Bank Ltd.,* 694 F.2d 54, 57 (2d Cir. 1982) .......................................................... 24

*Interested London Underwriters v. Kelly Global Logistics, Inc. et al.*, 2008 U.S. Dist. LEXIS 15768, *5 (S.D.N.Y. Feb. 29, 2008)........................................................................... 13, 14, 17

*Kao Hwa Shipping Co., S.A. v. China Steel Corp.*, 816 F. Supp. 910, 918 (S.D.N.Y 1993) ....... 23

*Katz v. Kar,* 192 A.D.2d 695 (2d Dep't 1993) .............................................................................. 8

*Kaymakcian v. Bd. of Managers of the Charles House Condo.*, 49 A.D.3d 407 (1st Dep't 2008) 8

*Lambert v. Sklar,* 30 A.D.3d 564 (2d Dep't 2006) ......................................................................... 8

*Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.,* 77 N.Y.2d 28 (1990) ...................... 14

*Murphy v. Korea Asset Mgmt. Corp.,* 421 F.Supp.2d 627, 639 (S.D.N.Y. 2005) ............ 18, 19, 21

*Overseas Media, Inc. v. Skvortsov,* 2008 U.S. App. LEXIS 10128, *2 (2d Cir. May 8, 2008)... 13, 17

*Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co, Ltd.,* 476 F.3d 140, 143 (2d Cir. 2007) .................................................................................................................................... 22

*Salzmann v. Prudential Secs., Inc.,* 1994 WL 191835, *7 (S.D.N.Y. May 16, 1994 ..................... 9

*Schmitz v. St. Regis Paper Co.,* 758 F. Supp. 922 (S.D.N.Y. 1991) ............................................ 13

*SEL-LEB Marketing, Inc. v. Dial Corp.,* 2002 U.S. Dist. LEXIS 15932, *8 (S.D.N.Y. Aug. 27, 2002) ....................................................................................................................................... 13

*Songbyrd v. Estate of Grossman,* 206 F.3d 172 (2d Cir. 2000) ................................................. 9, 11

*Sporn v. MCA Records, Inc.,* 58 N.Y.2d 482 (1983) ...................................................................... 8

*Svenska Finans Intern. BV v. Scolaro, Schulman, Cohen, Lawler & Burstein, P.C.,* 37 F.Supp.2d 178 (N.D.N.Y. 1999) ...................................................................................................... 8, 11

*Watson v. Mayo,* 2008 WL 538442, *7 (S.D.N.Y. Feb. 26, 2008) ............................................... 12

*Yakubov v. Sharon Towers Realty,* 2007 US App. LEXIS 15766 (2d Cir. July 2, 2007) ............. 11

**Statutes**

28 U.S.C. § 1603 ........................................................................................................................... 18

28 U.S.C. § 1604 ........................................................................................................................... 18

iv

28 U.S.C. §§ 1605-1607 .......................................................................................................... 18, 23

CPLR § 301.............................................................................................................................. 14, 15

CPLR § 302.............................................................................................................................. 15, 16, 17

**Other Authorities**

Bayerisches Stiftungsgesets, v. 19.12.2001 (GVBl 2002 S.10) ........................................ 20, 21, 22

**Preliminary Statement**

Almost six years ago, in June 2002, plaintiff Venetia Kapernekas willingly sent written wire instructions to close "at once" a trust account defendant Udo Fritz-Hermann Brandhorst had voluntarily opened for her benefit and transfer the $825,000 left in the account, so that it could be applied to the $3 million purchase price Mr. Brandhorst had agreed to pay for art he had purchased for his private collection. Ms. Kapernekas did so with full knowledge that Mr. Brandhorst would substitute the account with direct payments to her of $20,000 per month.

Mr. Brandhorst, who had fathered a child with Ms. Kapernekas, kept his word. For the next five years, Ms. Kapernekas accepted the monthly payments and other generous cash and in-kind benefits he voluntarily gave to her, totaling more $3.5 million – never once letting on that she claimed any interest in the art. It was only after Mr. Brandhorst hired counsel in 2007 to help him restore established and regular access to his child, which Ms. Kapernekas had spitefully cut off, that she first mentioned her claim to the art. But even then, she made no demand for "her" artwork until February 2008, shortly after Mr. Brandhorst filed a custody proceeding.

Thus, even accepting plaintiff's selectively-chosen allegations as true, she can no longer state a claim against any party because all of her claims are subject to a three-year statute of limitations and are now time-barred. Though plaintiff has named The Brandhorst Foundation as a defendant, her Complaint gives no indication of what the Foundation allegedly did that makes it liable to her. Furthermore, the Foundation is not present in New York State, and has done no business in New York State relating to this dispute. As such, it is not subject to personal jurisdiction here. In any event, as an organ of the State of Bavaria within the meaning of the Foreign Sovereign Immunity Act ("FSIA"), the Foundation is protected by sovereign immunity from suit in this Court. All claims against the Foundation must therefore be dismissed.

## STATEMENT OF FACTS

A.      The Relationship between Ms. Kapernekas and Mr. Brandhorst

At some point in the late 1990's, Ms. Kapernekas entered into a personal relationship with Mr. Brandhorst, a 69-year old German citizen and a noted art collector. Brandhorst Dec. ¶¶ 2-4.[1] Thereafter, Mr. Brandhorst began giving money to Ms. Kapernekas, even though he had no obligation to do so. *Id.* ¶ 5. In or around December 1998, Mr. Brandhorst deposited $900,000 of his own money into a trust account at a Swiss bank that was established for the benefit of Ms. Kapernekas (the "Account"). *Id.* ¶ 6. Mr. Brandhorst, however, retained power-of-attorney over the Account. *Id.* Towards the end of each month, Mr. Brandhorst would confer with the bank, and the bank would then generally send Ms. Kapernekas the interest on the Account, and sometimes a bit more, for her living expenses. *Id.* ¶ 7.

On ▓▓▓▓▓▓▓▓ Ms. Kapernekas gave birth to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ who is Mr. Brandhorst's biological daughter. Cpl. ¶ 10, Brandhorst Dec. ¶ 8. Ms. Kapernekas and Mr. Brandhorst agreed in writing to share joint custody of ▓▓▓▓▓▓ with Ms. Kapernekas acting as physical custodial parent. *Id.* Ex. A. Sometime after ▓▓▓▓▓ was born, Mr. Brandhorst told Ms. Kapernekas he intended to withdraw the remaining balance of the $900,000 he had previously deposited into the Account, but would do so with the understanding that he would make direct monthly payments to Ms. Kapernekas, so that she would still receive an amount equal to the original account deposit of $900,000. *Id.* ¶ 9.

Ms. Kapernekas was in complete agreement with this substitute payment arrangement. In fact, on or about July 1, 2002, Ms. Kapernekas sent written wire transfer instructions, at Mr.

---

[1] "Brandhorst Dec." refers to the declaration of Udo Fritz-Hermann Brandhorst executed on June 11, 2008. "Weinberg-Brodt Dec." refers to the declaration of Chaya Weinberg-Brodt, Esq. executed on June 11, 2008. A copy of the complaint is annexed as Exhibit 1 to the Weinberg-Brodt Declaration.

Brandhorst's request, directing the bank to transfer the entire remaining balance in the account (approximately $825,000) to an account in the name of Gagosian Gallery ("Gagosian"). She also directed the bank to close the Account "at once." *Id.* ¶ 10, Ex. B. The Account was closed, and the balance of the funds transferred to Gagosian, because Mr. Brandhorst had agreed to purchase from Gagosian two works of art by artist Damien Hirst for a total purchase price of $3,000,000 (the "Works"). *Id.* ¶¶ 12-13, Ex. C. As noted on the Gagosian invoice, which was made out to Mr. Brandhorst only, title to the Works would pass upon receipt of full payment, which was to come from two sources: $825,785 from the Account and the balance of $2,175,000 from his personal account. *See Id.*[2]

Although Ms. Kapernekas owns an art gallery devoted to contemporary art in New York City (Cpl. ¶ 6), it is undisputed that the Works were never delivered to her gallery. *Id.* ¶¶ 16-17. Instead, upon receipt of the full payment, the Works were delivered to Mr. Brandhorst in Germany, where they have remained ever since. Brandhorst Dec. at ¶ 14.

Mr. Brandhorst did not discuss with Ms. Kapernekas anything about the art he had purchased because she had no interest in either of the Works. *Id.* at ¶ 15. According to the Complaint, Mr. Brandhorst "did not disclose the identity" of the art to Ms. Kapernekas, who allegedly asked Mr. Brandhorst about it, and was told "not to worry." Thereafter, Mr. Brandhorst allegedly "rebuffed" all of her inquiries. Cpl. ¶¶ 17, 19-20.

Shortly thereafter, however, Mr. Brandhorst began making monthly direct payments to Ms. Kapernekas, as he told her he would. Specifically, he sent her $20,000 in cash each month during the period September 2002 through March 2008, for a total of $1,240,000. Brandhorst

---

[2] The Gagosian invoice, which is integral to plaintiff's Complaint, can be considered by this Court on a motion to dismiss. *ATSI Communications, Inc. v. The Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007).

3

Dec. ¶ 17; Ex. D. Mr. Brandhorst also gave her the use of his Visa credit card and he paid in full

all of the charges she made on the card issued to her during the period August 2002 through

January 2007, for payments totaling $457,898. *Id.* Furthermore, Mr. Brandhorst owns an

apartment on Wooster Street in New York City with an estimated monthly rental of $20,000 in

which he has permitted Ms. Kapernekas and ███████ to reside rent-free since November

2001, representing an in-kind benefit of $1,600,000. *Id.* ¶ 18.

Mr. Brandhorst also pays many of ███████ direct expenses, including private school

tuition and extra-curricular classes, which has amounted, over the years, to approximately

$58,780. *Id.* ¶ 19, Ex. D. He also has voluntarily paid school tuition for Ms. Kapernekas' son,

Orestes Kapernekas, since 2003, which has amount to approximately $76,175. *Id.*

In sum, during the period June 2002 through the present, Ms. Kapernekas has received a

cash and in-kind benefits totaling approximately $3,433,000, which is approximately $2,608,000

more than the approximately $825,000 he told her he would give her as a substitute for the

approximately $825,000 that was transferred out of the Account. *Id.* ¶ 20.[3]

By April 2004, the romantic relationship between plaintiff and Mr. Brandhorst had

ended. *Id.* ¶ 21. On April 29, 2004, Ms. Kapernekas sued Mr. Brandhorst in New York Family

Court, seeking additional child support and sole physical custody of ███████. Mr. Brandhorst

responded, and Ms. Kapernekas then voluntarily withdrew her claims on October 1, 2004. *See*

Weinberg-Brodt Dec. Exs. 2-5.

At no time prior to, during, or immediately after the 2004 proceedings did Ms.

Kapernekas raise the subject of the art that Mr. Brandhorst bought from Gagosian in 2002.

---

[3] Many of the payments are set forth in Mr. Brandhorst's Family Court filings. *See* Weinberg-Brodt Dec. Ex. 7 ¶ 17. These documents are subject to judicial notice. *E.g., Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 391 (S.D.N.Y. 2001).

Specifically, she did not raise this issue in the Family Court, or include the alleged existence of "her" artwork in her petition. Brandhorst Dec. ¶¶ 23-24. Likewise, she did not seek return of the art she now claims is "hers" from Mr. Brandhorst or his attorneys. *Id.*

Ms. Kapernekas' failure to even mention the art she now claims is "hers" is quite telling. As is evident from the fax header, Ms. Kapernekas faxed a copy of her July 2002 wire transfer instructions to Mr. Brandhorst's office on June 23, 2004 and then called Mr. Brandhorst's assistant to reconfirm what it said, claiming that she wanted to discuss the matter with her attorney. Brandhorst Dec. ¶ 23, Ex. B. In fact, it was only after Mr. Brandhorst commenced a custody proceeding on *January 23, 2008* seeking a court order directing Ms. Kapernekas to restore established and regular access to his daughter, that Ms. Kapernekas first made demand for the return of "her" art by letter dated January 31, 2008. *Id.* ¶ 25, Ex. E; Weinberg-Brodt Dec. Ex. 6. She then waited another three months to commence this action to recover art that does not belong to her.

B.    The Brandhorst Foundation

The Foundation was founded by Mr. Brandhorst and his late wife, in or around December 1993, with the approval, and under the supervision of the Government of Bavaria. Brandhorst Dec. ¶ 28, Ex. F. The Foundation is a public, not-for-profit organization established, under Bavarian law, for the purpose of preserving significant works of art for the Bavarian people and to encourage artistic and scientific advancements in Bavaria. The Foundation's art collection includes the Brandhorst Collection. which holds over 700 significant works of seminal artists of the twentieth century, including Pablo Picasso, Cy Twombly, Andy Warhol, Sigman Polke, Bruce Nauman, Mike Kelley and many others. *Id.*

5

The Brandhorst Collection was permanently secured for the Bavarian State in 1999. *Id.*
To expand upon the Foundation's goals, the State of Bavaria is in the process of building the
Brandhorst Museum at Munich's Kunstareal, for public display of the Brandhorst Collection for
the people of Bavaria (the "Museum"). *Id.* ¶ 33, Ex. F. The State of Bavaria owns the land on
which the Museum is being built and it has agreed to underwrite the cost of the construction of,
and ongoing maintenance for, the Museum. *Id.* ¶ 34. The Museum will be owned by the State of
Bavaria, and its employees will be public employees paid by the State of Bavaria. *Id.* ¶ 35. The
Foundation, for which Mr. Brandhorst serves as the President and a director, has never had any
dealings with Ms. Kapernekas. *Id.* ¶¶ 30, 36. Nor has the Foundation transacted any business in
New York or otherwise engaged in conduct that would subject it to the jurisdiction of this Court.
*Id.* ¶¶ 37-50. Furthermore, the Foundation has no ownership or other interest in the art that is the
subject of this litigation; this art instead belongs solely to Mr. Brandhorst. *Id.* ¶¶ 30, 32.

C.      The Allegations of the Complaint

After almost six years of silence, Ms. Kapernekas filed her Complaint on April 29, 2008,
seeking "recovery" of art that was never hers.[4] According to the Complaint, in the spring of
2002, Mr. Brandhorst offered to help Ms. Kapernekas invest in contemporary art (Cpl. ¶ 11), and
Ms. Kapernekas allegedly gave Mr. Brandhorst "her funds" to invest. Cpl. ¶ 13. Specifically,
plaintiff allegedly transferred approximately $825,000 from "her" bank account to Gagosian, for
the purpose of buying art. *Id.* ¶ 15. Thereafter, Mr. Brandhorst allegedly took possession of the
art, and, at all times thereafter, refused to disclose its identity or location to plaintiff. *Id.* ¶¶ 16-
17, 19-21. The Complaint does not allege that the Foundation played any role in these events.

---

[4] For purposes of a motion to dismiss, the Court must accept the well-pleaded factual allegations
of the complaint as true. However, legal conclusions and unsupported theories or conclusions
about the factual allegations need not be accepted as true. *E.g., Haviland v. J. Aron & Co.,* 796
F. Supp. 95, 97 (S.D.N.Y. 1992).

Notably, the Complaint gives no indication of how Ms. Kapernekas came into such a large amount of money nor does it mention that she accepted more than $3.5 million from Mr. Brandhorst as part of the arrangement he made. There also is no allegation of an agreement, express or implied, written or oral, that Mr. Brandhorst would hold the art for plaintiff, for any specified or unspecified length of time, let alone allege what purpose doing so could possibly serve. Instead, the events outlined by the Complaint demonstrate that Mr. Brandhorst simply took possession of the art in June 2002 for his personal use and to the open exclusion of ownership rights of any other person or entity, including Ms. Kapernekas. *See* Cpl. ¶¶ 16-17, 19-21.

As further demonstrated below, all of plaintiffs' claims fall outside the three-years statute of limitations, and therefore fail to state a claim. In addition, during Ms. Kapernekas' extended period of silence, Mr. Brandhorst has already given Ms. Kapernekas far more than the approximate $825,000 (of his money) which he used to pay for his art, a gesture he would not have made had Ms. Kapernekas earlier laid claim to the Works. *See* Brandhorst Dec. ¶ 24.

## ARGUMENT

### POINT I

### ALL OF PLAINTIFF'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS AND BY LACHES

A.    All of Plaintiff's Claims are Untimely

The Complaint fails to state a claim because, taking all its allegations as true, all four of its claims are untimely. The statute of limitations for each of plaintiff's claims (replevin, conversion, breach of fiduciary duty, and unjust enrichment) is three years. Under New York law, the statute of limitations for claims for recovery of chattel is three years. *See Gold Sun Shipping Ltd. v. Ionian Transp. Inc.*, 245 A.D.2d 420, 421 (2d Dep't 1997) (three-year statute of

7

limitations for conversion claims); *Katz v. Kar*, 192 A.D.2d 695, 696 (2d Dep't 1993). Under

New York law, a conversion claim accrues when a defendant begins exploiting the property as

his own. *Sporn v. MCA Records, Inc.*, 58 N.Y.2d 482, 488 (1983). Likewise, where – as here –

replevin is sought against the person who originally converted the property, the statute of

limitations is three years, and the three years start running on the date of the conversion. *In re*

*Peters*, 34 A.D.3d 29, 36 (1st Dep't 2006).

According to the Complaint, in June 2002, Mr. Brandhorst took possession of the art for

his own benefit (notwithstanding that plaintiff owns a contemporary art gallery in New York,

where "her" art could be stored or displayed), refused to identify the art in question or inform

plaintiff of its location, and rebuffed all her attempts to discuss it. Cpl. ¶¶ 17, 19-20. Plaintiff's

Complaint thus confirms that her conversion and replevin claims accrued in June 2002, when

Brandhorst openly appropriated his artwork for himself. These claims then expired three years

later, in June 2005, long before this Complaint was filed.

Plaintiff's claims for breach of fiduciary duty and unjust enrichment exclusively seek

monetary damages. Cpl. ¶¶ 40, 46. Therefore, their limitations period is three years. *Svenska*

*Finans Intern. BV v. Scolaro, Schulman, Cohen, Lawler & Burstein, P.C.*, 37 F.Supp.2d 178,

184-85 (N.D.N.Y. 1999); *Kaymakcian v. Bd. of Managers of the Charles House Condo.*, 49

A.D.3d 407 (1st Dep't 2008) (where plaintiffs seek monetary damages, breach of fiduciary duty

claim is subject to three-year statute of limitations); *Grynberg v. ENI S.p.A*, 2007 US Dist.

LEXIS 65787, *9 (S.D.N.Y. September 5, 2007) (three-year statute of limitations for unjust

enrichment claim which seeks monetary damages); *Lambert v. Sklar*, 30 A.D.3d 564, 566 (2d

Dep't 2006).[5]

---

[5] In any event, the breach of fiduciary duty and unjust enrichment claims are nothing more than
duplicative pleadings of the conversion claim. As such, they cannot be utilized to attempt to gain
a longer statue of limitations. *Gold Sun Shipping*, 245 A.D.2d at 421 ("the cause of action

As a matter of law, Ms. Kapernekas' claims for breach of fiduciary duty and unjust enrichment also accrued in June 2002. At that time, Ms. Kapernekas allegedly transferred funds to Gagosian, which in turn delivered the Works to Mr. Brandhorst in Germany. According to the Complaint, Mr. Brandhorst refused to give plaintiff any further information about the identity or location of the art. The statute of limitation for breach of fiduciary duty begins to run upon the occurrence of the alleged wrongful act. *Salzmann v. Prudential Secs., Inc.*, 1994 WL 191835, *7 (S.D.N.Y. May 16, 1994). The statute of limitations for unjust enrichment begins to run upon the occurrence of the wrongful act giving rise to a duty of restitution. *Grynberg*, 2007 US Dist. LEXIS 65787 at *15. As the Complaint was not filed until April 28, 2008, almost six years later, these claims are untimely.

B.    Plaintiff Cannot Use Artful Pleading to Evade the Statute
      of Limitations for her Replevin and Conversion Claims

From her Complaint, it appears that plaintiff may be trying to use artful pleading to create the illusion of an "infinite bailment" in order to evade the statute of limitations on her claims for replevin and conversion. This attempt fails. In situations where an infinite bailment of chattel truly does exist, the limitations period does not accrue until a demand is made for return of the chattel, and that demand is rejected. However, even in such a case, a demand must be made within a reasonable time. *Herrington v. Verrilli,* 151 F. Supp.2d 449, 460-61 (S.D.N.Y. 2001) (citations omitted); *accord Songbyrd v. Estate of Grossman,* 206 F.3d 172, 183 (2d Cir. 2000) (plaintiff must make demand within a reasonable time, if plaintiff knows location of property).

---

alleging breach of fiduciary duty and the demand for the imposition of a constructive trust were also properly dismissed based on the three-year Statute of Limitations applicable to conversion, because the legal remedy for conversion would have afforded the plaintiffs full and complete relief.") (citations omitted).

9

Even if this were a case where demand and refusal are required, plaintiff's delay is unreasonable as a matter of law. According to her Complaint, the art was purchased, purportedly with "her" funds, in June 2002, yet plaintiff failed to make formal demand until February 2, 2007. Cpl. ¶ 20. Moreover, in April 2004, plaintiff sued Mr. Brandhorst in family court for additional child support and to terminate his joint custody. By or before April 2004, plaintiff's personal relationship with Mr. Brandhorst was clearly over, and any notion she might have held, in her own mind, that Mr. Brandhorst was storing "her" art (for whatever unknown reason) could no longer reasonably be maintained. Therefore, if Ms. Kapernekas truly believed that the art was hers, she was obliged to ask for it at that time. Instead, she waited another two and half years to do so, which is unreasonable as a matter of law. *Herrington,* 151 F.Supp.2d at 460-61 (where plaintiff waited one and a half years after initial lawsuit against defendant to demand return of chattel, delay was unreasonable and claim was time-barred).

In any event, this is not a case where demand and refusal are required. To the contrary, plaintiff has failed to allege any facts to support an "infinite bailment" theory, and her conclusory theories that one existed are inherently illogical.[6] Specifically, the Complaint does not allege that plaintiff and Mr. Brandhorst ever reached any oral, written, or tacit agreement that Mr. Brandhorst would take possession of "her" art, while concealing its identity and location from her, and store it "for her," for any amount of time. Certainly, plaintiff fails to set forth any salient terms of any (non-existent and non-alleged) agreement, or explain any "investment" or

---

[6] While on a motion to dismiss, the Court must treat all well-plead factual allegations as true, the Court need not accept plaintiffs' conclusions, contentions, and theories about these facts, especially where they are unsupported by the complaint's factual allegations, facially illogical, implausible, or internally inconsistent. *See Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1969-71 (2007) (where theory of complaint is implausible, complaint cannot survive motion to dismiss); *accord Haviland,* 796 F. Supp. at 100-02 ("farfetched" contentions in complaint rejected, even if asserted in the guise of "factual" allegations).

687554-7

other logical purpose such an agreement could possibly have had. Indeed, the Complaint suggests no reason why, if the art truly belonged to plaintiff, Mr. Brandhorst would transport the art from Gagosian in New York, to some undisclosed location, rather than to plaintiff's New York gallery, for plaintiff to display. To the contrary, the facts alleged in the Complaint lead to one logical conclusion only – Mr. Brandhorst unilaterally took exclusive possession and control of the art he bought for himself using his own funds, without any prior consultation with plaintiff, and accordingly rebuffed all of plaintiff's further attempts to gain information about the art, its identity, or its whereabouts, precisely because it is none of her business.

Under these circumstances, Mr. Brandhorst's assumption of exclusive possession, control, use, and enjoyment, coupled with his refusal to give plaintiff the Works to display or any information about the Works, renders plaintiff's attempt, so many years later, to seek to infer the conclusion of "bailment" as "implausible." Instead, this conduct (which Mr. Brandhorst maintains was rightful, as the Works were always his and intended to be his) immediately triggered the statute of limitations as a matter of law on July 1, 2002 (the date of wire transfer instructions), without any need for a "demand." *See Yakubov v. Sharon Towers Realty*, 2007 US App. LEXIS 15766 (2d Cir. July 2, 2007) (summary order) (where defendant's initial possession is allegedly unlawful or demonstrates clear claim of ownership, statute of limitations for conversion claim is immediately triggered without any need for a demand, even if plaintiff is unaware of the taking); *Songbyrd*, 206 F.3d at 181-83 and n.17 (conversion claim time barred; although plaintiff claimed a "bailment of indefinite duration," the facts actually alleged showed, instead, a conversion by the defendant as of a date certain; "New York has not required a demand and refusal for the accrual of a conversion claim against a possessor who openly deals with the property as its own."); *Svenska*, 37 F.Supp.2d at 184-85 (N.D.N.Y. 1999) (dismissing conversion claim as untimely; even if defendants initially lawfully came into possession of the

property, statute of limitations was triggered when they took overt and positive acts without authority from plaintiff to exercise control over the property and to divest plaintiff of control, and therefore no demand was necessary to trigger statute of limitations); *Close-Barzin v. Christie's Inc.*, 2008 WL 1946724, *1 (1st Dep't May 6, 2008) (conversion claim time barred; where defendant knowingly consigned and sold property, "a demand and refusal was not a prerequisite to commencement of an action for conversion").

Finally, plaintiff's delay in making demand constitutes laches. *See Watson v. Mayo*, 2008 WL 538442, *7 (S.D.N.Y. Feb. 26, 2008) (dismissing claim on the basis of laches where plaintiff's unexcused delay in asserted known claim caused prejudice to defendant). Here, all elements of laches are manifestly satisfied. Plaintiff unreasonably delayed in seeking return of "her" art, while Mr. Brandhorst had no notice that she would do so. Indeed, plaintiff failed to even mention the Works, much less demand their return, or payment for their fair value in April 2004, when she first sued Mr. Brandhorst in New York Family Court, for, among other things, additional child support. In doing so, she lulled Mr. Brandhorst into believing that she, too, understood that the Works were his and she had no intention of laying claim to them.

Mr. Brandhorst clearly was prejudiced by plaintiff's delay, because he continued to provide substantial amounts of money to plaintiff on a monthly basis, even after she filed and withdrew the April 2004 suits against him. Mr. Brandhorst would not have done so had he understood that plaintiff also intended to lay claim to the remaining balance of the lump sum he had originally deposited in the Swiss account. It is entirely unreasonable, though telling, for plaintiff to silently accept the substitute arrangement and Mr. Brandhorst's additional generous support for nearly six years, under false premises, and then make a belated demand for "her" art, which he purchased for himself with his own money, pursuant to wire transfer instructions she

willingly sent.[7] *See Schmitz v. St. Regis Paper Co.*, 758 F. Supp. 922, 924 (S.D.N.Y. 1991) (plaintiff's three-year delay in asserting claim constituted laches where, during that time, defendant had changed its position towards plaintiff, in reliance on plaintiff's silence as acquiesce to defendant's conduct).

## POINT II

### THE COURT HAS NO PERSONAL JURISDICTION
### OVER THE BRANDHORST FOUNDATION

Plaintiff has the burden to establish that the court may exercise personal jurisdiction over a defendant. *Interested London Underwriters v. Kelly Global Logistics, Inc. et al.*, 2008 U.S. Dist. LEXIS 15768, *5 (S.D.N.Y. Feb. 29, 2008). Because subject matter jurisdiction is predicated on diversity, Ms. Kapernekas was required to, but did not, plead facts sufficient to make a *prima facie* showing that personal jurisdiction over the Foundation exists under New York State law. *See* CPLR §§ 301-302; *Overseas Media, Inc. v. Skvortsov*, 2008 U.S. App. LEXIS 10128, *2 (2d Cir. May 8, 2008) (summary order). In fact, Ms. Kapernekas pleads no jurisdictional facts against the Foundation, and the reason is obvious.

---

[7] Though plaintiff was careful not to mention these irrefutable facts in her Complaint, the Court may properly consider them on this motion to dismiss, as integral to those allegations she did make in her Complaint. *See SEL-LEB Marketing, Inc. v. Dial Corp.*, 2002 U.S. Dist. LEXIS 15932, *8 (S.D.N.Y. Aug. 27, 2002) (just because plaintiff "studiously avoids" allegations regarding certain documents in its pleadings does not make those documents any less integral to the complaint, and thus, the court may properly consider them on a motion to dismiss); *see also* n.6, *supra*. As such, a further basis exists to dismiss plaintiff's Complaint in its entirety because plaintiff long ago knowingly waived any right she may have had in the remaining funds in the Account or the Works that were purchased in part with those funds, by reason of her having willingly given the written instructions and then accepting the monies given to her under the substitute arrangement and by having failed to include a claim for "her" art (or the proceeds thereof) in her 2004 support/custody proceedings, even though she specifically sought a copy of the wire transaction for that purpose. Brandhorst Dec. ¶ 23. *See SEL-LEB Marketing, Inc.* 2002 U.S. Dist. LEXIS 15932 at *8 ("Waiver is an intentional relinquishment of a known right and requires a clear manifestation of intent.").

A.       The Foundation is Not Subject to General Jurisdiction Under CPLR § 301

Section 301 confers general personal jurisdiction over a foreign corporation only if it is "engaged in such a continuous and systematic course of 'doing business' in New York as to warrant a finding of 'presence' in the state." *Interested London Underwriters*, 2008 U.S. Dist. LEXIS 15768 *8 (citations omitted). To be found 'doing business' in the state for Section 301 purposes, a corporation must be present in the state "not occasionally or casually, but with a fair measure of permanence and continuity." *Id.* at *8, *quoting Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 77 N.Y.2d 28 (1990). In determining whether jurisdiction under CPLR § 301 is proper, the factors courts generally consider are, "(1) the existence of an office in New York; (2) the solicitation of business in New York; (3) the presence of bank accounts and property in New York; and (4) the presence of employees or agents in New York." *Id.* at *8-9.

Ms. Kapernekas alleges no facts connecting the Foundation to New York. By contrast, the Brandhorst Declaration demonstrates that the Foundation is not doing business in New York State within the meaning of CPLR § 301. The Foundation is a German non-profit entity, organized as a Bavarian public foundation, for the purpose of cultural development for the people of the State of Bavaria. *See* Brandhorst Dec. ¶¶ 28-29, 37. The Foundation has no office in New York, and no interest in any real or personal property in New York. *Id.* ¶¶ 38, 40, 41. The Foundation is not incorporated or qualified to conduct business in New York. *Id.* ¶¶ 39-40. It employs no officers, agents, or employees in New York. *Id.* ¶ 43. It does not itself, or through any agent, solicit business in New York, advertise in New York, maintain a telephone listing in New York, or ship any goods or products to or in New York. *Id.* ¶¶ 42, 45-46.[8]

---

[8] The Foundation has, on numerous occasions, purchased art from persons or entities within the State of New York, but the Foundation has not sold any art, or sought or solicited to sell any art, or shipped any art to any person or entity in New York (or anywhere else). *See* Brandhorst Dec. ¶ 29; *Diesel Sys., Ltd. v. Yip Shing Diesel Eng. Co., Ltd.*, 861 F. Supp. 179, 181-82 (E.D.N.Y. 1994) (CPLR § 301 does not apply to the purchase of goods from New York).

Simply put, the Foundation is not engaged in any continuous or systematic activity in New York, and is, accordingly, not present within this state at any level, let alone the systematic and continuous presence required by CPLR § 301.

B.    CPLR § 302 Does Not Confer Jurisdiction

Although the Complaint is woefully vague on its jurisdictional basis, any potential argument that the Foundation is subject to specific personal jurisdiction under CPLR § 302(a) fails. Section 302 states, in relevant part:

> (a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . ., who in person or through an agent:
>
> (1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> (2) commits a tortious act within the state . . .; or
>
> (3) commits a tortious act without the state causing injury to person or property within the state . . . if he
>
> > (i)    regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
> >
> > (ii)   expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

*Id.*

1.    The Foundation Transacted No Business in New York State Related to this Dispute

In order for Ms. Kapernekas to make a *prima facie* case under Section 302(a)(1), she was required to, but did not and cannot, plead facts showing that the Foundation transacted business in New York, and that her cause of action arose out of that business, "such that an articulable nexus exists between them." *Neewra v. Manakh Al Khaleef Gen. Trading*, 2004 U.S. Dist.

15

LEXIS13556, *9 (S.D.N.Y. 2004) (citation omitted). A defendant transacts business in New York within the meaning of CPLR § 302(a)(1) when it "'purposefully avails' himself of the privilege of conducting business there, thus invoking the benefits and protections of New York law." *Id.* at *9 (citation omitted).

Here, the Complaint fails to allege that the Foundation transacted any business at all that has any nexus to plaintiff's Complaint, let alone business in New York. Instead, plaintiff alleges that Mr. Brandhorst, in his personal capacity, directed her to send (his) money to Gagosian, and then personally took and kept possession of undisclosed art, without prior consultation with plaintiff as to its disposition. Because the Foundation transacted no business, and had no alleged dealings, with either plaintiff or Gagosian with respect to the subject matter of this Complaint, it is not subject to personal jurisdiction under CPLR § 302(a)(1).

    2.    The Foundation Committed No Tortious
             Act in New York Related to this Dispute

In order for Kapernekas to make a *prima facie* case under CPLR § 302(a)(2), she was required to, but did not and cannot, plead factual allegations showing that the Foundation committed a tortious act within the state. This she fails to do. Indeed, plaintiff fails to plead that the Foundation committed any tortious act all with respect to her claims, let alone one in New York. Specifically, Ms. Kapernekas does not allege that the Foundation ever communicated with her regarding the Gagosian transaction, instructed her to transfer money to Gagosian, or took possession of the Works in New York. Indeed, the only allegation even remotely relevant to the Foundation is plaintiff's speculative allegation that at some unspecified future time, the art might be displayed in the Museum. Cpl. ¶ 44. Even if this potential future display could be considered a tortious act on the part of the Foundation should it ever occur (as a result which is not conceded), it would be an act in Germany, not an act in the United States. Jurisdiction under

CPLR § 302(a)(2) is, therefore, unavailable. *See Overseas Media*, 2008 U.S. App. LEXIS 10218, *6 (summary order) (tortious act committed by defendants while not physically present in New York is insufficient under CPLR § 302(a)(2) to confer personal jurisdiction).

      3.    The Foundation is Not Subject to Jurisdiction under CLPR § 302(a)(3)

      CPLR § 302(a)(3) is likewise unavailing because Ms. Kapernekas fails to allege that the Foundation committed any act at all outside New York causing injury to her in New York, let alone a tortious act. Furthermore, even if the speculative future display of the Works in the Museum could be considered a tortious act on the part of the Foundation, should it ever occur (a result which is not conceded), any damages from that speculative act, for the purposes of CPLR § 302 (a)(3), will occur in Germany, not in New York. *See Neewra*, 2004 U.S. Dist. LEXIS 13556, **18-19 (situs of injury from out-of-state act is the location of the event causing the injury, not the location where the resulting damages are felt by plaintiff); *accord, Interested London Underwriters*, 2008 U.S. Dist. LEXIS 15768, **13-14. Thus, if and to the extent that a potential (but as yet wholly speculative) future display of the Works in the Museum ever causes a future (as yet unspecified) additional injury to plaintiff, that injury will occur in Germany, within the meaning of CPLR § 302 (a)(3), not in New York.

      In any event, both Sections 302(a)(3)(i) and 302(a)(3)(ii) are unavailable to establish New York jurisdiction over the Foundation, because Ms. Kapernekas fails to allege that the Foundation, "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered," in New York, (*see* CPLR 302(a)(3)(i)), or that the Foundation, "derives substantial revenue from interstate or international commerce." CPLR 302(a)(3)(ii). Indeed, it does not. The Foundation is a public foundation, which derives no revenue from interstate or international commerce. All

of its assets were received via donation, not via any sort of international or interstate commence.

Brandhorst Dec. ¶ 29.

POINT III

**ALTERNATIVELY, THE FOUNDATION IS IMMUNE FROM SUIT IN THIS
COURT PURSUANT TO THE FOREIGN SOVEREIGN IMMUNITIES ACT**

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* is the "sole

basis for obtaining jurisdiction over a foreign state in the courts of this country." *Murphy v.*

*Korea Asset Mgmt. Corp.*, 421 F.Supp.2d 627, 639 (S.D.N.Y. 2005) (citation omitted). Under

the FSIA, foreign states and their agents or instrumentalities are immune from the exercise of

jurisdiction in the courts of the United States unless one of the statute's explicit exceptions to

immunity applies, which is not the case here. 28 U.S.C. §§ 1604, 1605-1607.

Section 1603 (a) defines a "foreign state" as "a political subdivision of a foreign state or

an agency or instrumentality of a foreign state." An "agency or instrumentality of a foreign

state" is defined in Section 1603(b) as any entity "(1) which is a separate legal person, corporate

or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a

majority of whose shares or other ownership interest is owned by a foreign state or political

subdivision thereof, and (3) which is neither a citizen of a State of the United States...nor created

under the laws of any third country." 28 U.S.C. § 1603(b).

The Foundation is a non-profit entity organized under the laws of the State of Bavaria,

Germany, and thus clearly satisfies the first and third prongs of Section 1603(b). The

Foundation also qualifies as "an organ" of the German government. The term "organ" is broadly

interpreted to reflect Congress' intent that it be "difficult for private litigants to bring foreign

governments into Court." *Murphy*, 421 F.Supp.2d at 640.

18

Generally, courts consider the following factors in determining whether an entity is an "organ" of a foreign state:

>    (1) whether a foreign state created the entity for a national purpose;
>
>    (2) whether a foreign state actively supervises the entity;
>
>    (3) whether a foreign state requires the entity to hire public employees and pays their salaries;
>
>    (4) whether the entity holds exclusive rights to some right in a [foreign] state; and
>
>    (5) whether the entity is treated as a governmental organ under the laws of a foreign state.

*Id.* at 641, *citing Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004). In making this analysis, district courts are to "engage in a balancing process, without particular emphasis on any given factor and without requiring that every factor weigh in favor of, or against the entity claiming FSIA immunity." *See Murphy*, 421 F.Supp.2d at 641. Thus, even if some factors are not met, an entity can be deemed an "organ" of a foreign state based on the presence of other factors. When viewed in light of these standards, the Foundation is immune from jurisdiction of any court in the United States because it qualifies as an "organ" of the State of Bavaria.

A.    The Foundation was Created For a National Purpose

The Foundation was established as a public foundation with the approval of the State of Bavaria, for a national purpose, namely, to provide Bavarian citizens with a significant collection of artwork created by seminal artists of the twentieth century. Brandhorst Dec. ¶ 28, and Ex. F. The Foundation maintains the Brandhorst Collection, which includes over 700 works of art by artists such as Pablo Picasso, Cy Twombly, Andy Warhol, Sigmar Polke, Bruce Nauman, Mike Kelley and many others. *Id.* ¶ 28. The Brandhorst Collection was permanently secured as part of the Foundation for the State of Bavaria in 1999. *Id.* Ex. F. The Foundation provides local

cultural development for the citizens of Bavaria. In addition, the presence of the Foundation

provides a number of artistic and scientific advancements for the State of Bavaria. It is

unquestionable that the preservation and development of art are national goals. *See generally,*

*Aschenbrenner v. Conseil regional de Haute-Normandie,* 851 F. Supp. 580, 585 (S.D.N.Y. 1994)

(setting forth national purposes of advancing culture in FSIA claim).

B.      The Bavarian Government Actively Supervises the Foundation

The Foundation, though initially established by a private individual, is a public

foundation, established in accordance with the Bavarian Law on Foundations ("Bavarian

Foundation Law")[9] to acquire and preserve works of art for the benefit of the people of the State

of Bavaria. The Foundation is controlled and regulated by the Bavarian government to ensure

that it fulfills its stated public purpose.

In particular, as provided in the Foundation Law, the Bavarian government serves as the

"foundation regulatory authority" for public foundations. BFL Art. 18(1). It does this through

the State Ministry for Science, Research and Art, which acts as the supreme foundation

regulatory authority for the Foundation, as it is dedicated to securing and preserving important

works of art for display in a Museum being built by the State of Bavaria for the people of

Bavaria. BFL Art. 18(2).

Any amendment of the Foundation's formation papers requires governmental approval.

BFL Art. 9(3). Governmental approval also is required for (i) acceptance of additional donations

that have an obligation attached to them which permanently exceeds the value of such donation

or that serve a wider or different purpose than the main foundation; (ii) the sale or substantial

---

[9] Bayerisches Stiftungsgesets, v. 19.12.2001 (GVBI 2002 S.10)("BFL"). A true and correct
translated copy of the relevant provisions of Bavarian Law on Foundations is attached to the
Weinberg-Brodt Declaration as Exhibit 8 pursuant to F.R.C.P. 44.1.

alteration of objects that have a specific scientific, historical or artistic value; and (iii) the

execution of deposit contracts and related legal documents that have as their purpose the

collateralization of another's debt. BFL Art. 27; *see also Murphy,* 421 F.Supp.2d at 643

(Korean corporation was subject to significant government control where government actively

oversaw and supervised corporation by periodically auditing and inspecting corporation and

exerting control over passage of all resolutions concerning, and amendments to, corporation's

operational policies and budgets).

     Moreover, in its capacity as the foundation regulatory authority, the Bavarian government

actively supervises the activities of the Foundation by, among other things:

- Advising the Foundation as to the fulfillment of its tasks, promoting and protecting the
  Foundation, and strengthening the decision-making power and self-government of the
  Foundation's organ. BFL Art. 19.

- Overseeing the orderly and timely provisions for the Foundation, and monitoring the
  Foundation's affairs to make sure it is in compliance with Bavarian law and the
  Foundation's statute. BFL Art. 20(1).

- Monitoring the preservation of the Foundation's property as well as its use of income and
  any donations, to ensure that such assets are being used according to the statutes. *Id.*

- Overseeing the composition of and changes to the Foundation's Board and Advisory
  Council. BFL Art. 20(2).

- Visiting the Foundation's buildings and events, checking the conduct of activities and
  bookkeeping, conducting large-scale audits, and demanding reports and files. BFL
  Art. 20(3).

- Monitoring the Foundation for any illegal behavior, with the power to take appropriate
  remedial measures, including the right to demand the removal of the Foundation's
  members and to appoint new members. Arts. 20(4), (5), 21.

- Overseeing the financial expenditures of the Foundation and its income. BFL Art. 27.

     In addition, the government of the State of Bavaria also owns the land on which the

Museum is being built and has agreed to underwrite the cost of the construction of, and ongoing

maintenance for, the Museum. Brandhorst Dec. at ¶ 34. Museum employees will be paid by the State of Bavaria, thereby providing another means by which the Bavarian government will be in a position to actively supervise the activities of the Foundation.

C.    Public Employees

The Foundation itself has no public employees, and the salaries of its small staff are paid out of the assets of the Foundation. However, upon its completion, the State of Bavaria will pay the salaries of all Museum employees using public funds. *See* Brandhorst Dec. ¶ 35.

D.    The Foundation Holds Exclusive Rights in the State of Bavaria

The State of Bavaria has given the Foundation the sole and exclusive right to display art at the Museum, which is being built, operated and maintained by the government of Bavaria, using public funds, for the benefit of the people of the State of Bavaria. *See* Brandhorst Dec. ¶ 35. Such right is another factor, which confers upon the Foundation the sovereign immunity afforded to governmental organs. *See Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co, Ltd.*, 476 F.3d 140, 143 (2d Cir. 2007) ("exclusive right" prong satisfied where financial service agency acted as an oversight agency for the Republic of Korea with the exclusive right to receive monthly business reports from solvent financial institutions it oversaw).

E.    The Foundation is Treated as an "Organ" of the Bavarian Government

As provided in Article 1 of the Foundation Law, "public foundations" are defined to include "foundations capable of holding rights under civil law that do not pursue exclusively private purposes and foundations capable of holding rights under public law." BFL Art. 1(2). In other words, a "public foundation" formed under Bavarian law need not be exclusively for a public purpose, so long as the foundation pursues public functions of the type sanctioned by the Foundation Law. *See, e.g., Murphy,* 421 F. Supp.2d at 644-45 (while a corporation may be

treated as a private entity in some circumstances and as an agency of the government under other

circumstances, corporation still considered an "organ" for purposes of FSIA immunity). Art and

other purposes that serve the public good are among those "public purposes" expressly

sanctioned by the Foundation Law.  BFL Art. 1(3)(2).

    Accordingly, the Foundation, which was formed pursuant to the Foundation Law, is a

public foundation dedicated to the acquisition and preservation of important works of art to be

exhibited in a Museum currently being built for the benefit the public, and at the expense, of the

State of Bavaria.  For all of the foregoing reason, it thus has been, and will continue to be, treated

as an organ of the Bavarian government and in that capacity, is subject to sovereign immunity

from jurisdiction of this Court.[10]

---

[10] None of the exceptions set forth in 28 U.S.C. §§ 1605-1607 apply to the Foundation.  The only exception even potentially relevant is 28 U.S.C. § 1605(a)(2), which provides an exception where an "action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the Unites States in connection with a commercial activity of the foreign state elsewhere, or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere, and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  As demonstrated in Points II and IV, the Foundation did not engage in any commercial activity, whether within or without the United States, with respect to the art at issue or to this dispute, and the Complaint does not allege that it did so.  Therefore 28 U.S.C. § 1605(a)(2) is inapplicable.  *Aschenbrenner,* 851 F. Supp. 2d at 585 (cultural exhibitions, without profit motive, are not "commercial activity").  Furthermore, even assuming that the speculative future display of the Works at the Musuem would be "commercial activity," if it ever happens, that would be activity in Germany, having effect in Germany – not activity in New York.  *Antares Aircraft, L.P. v. Fed. Republic of Nigeria,* 999 F.2d 33, 36 (2d Cir. 2003); *Kao Hwa Shipping Co., S.A. v. China Steel Corp.,* 816 F. Supp. 910, 918 (S.D.N.Y 1993).

POINT IV

THE COMPLAINT CONTAINS NO FACTUAL ALLEGATIONS
AGAINST THE BRANDHORST FOUNDATION, AND
THEREFORE FAILS TO STATE A CLAIM AGAINST IT

Although Ms. Kapernekas names the Foundation as a defendant, her Complaint is devoid of *any* allegation against it, or any explanation as to why it was sued. Indeed, her Complaint does not allege, let alone try to explain, the Foundation's involvement in any part of the underlying events. Thus, taking all her allegations as true, plaintiff had no dealings with the Foundation, entered into no relationship with it at all, and the Foundation took no action with respect to plaintiff, or with respect to the art at issue here. Likewise, plaintiff does not (and legitimately cannot) allege that the Foundation currently owns or has any interest in the art in question, or that it ever owned, or asserted any interest with respect to this art. To the contrary, the art is owned by Mr. Brandhorst personally. Brandhorst Dec. ¶ 32. Plaintiff's speculation that at some unknown point in the future Mr. Brandhorst might make the Works part of the Foundation and/or display them in the Museum simply does not state a current claim.

For this reason, Ms. Kapernekas' claims for conversion, replevin, and unjust enrichment all fail as against the Foundation. *Batsidis v. Batsidis*, 9 A.D.3d 342, 343 (2d Dep't 2004) (claims for conversion and replevin require allegation that defendant took possession of specific property in which plaintiff claims a superior right); *Indyk v. Habib Bank Ltd.*, 694 F.2d 54, 57 (2d Cir. 1982) (claim for unjust enrichment fails when plaintiff fails to plead that defendant was unjustly enriched).

In this same vein, Ms. Kapernekas fails to state a claim for breach of fiduciary duty against the Foundation, because she does not allege the existence of any relationship, or indeed of any communication or dealings between herself and the Foundation, let alone a fiduciary relationship. *See Fagan v. Comanche Inv., LLC*, 2006 U.S. Dist. LEXIS 66065, *15 (S.D.N.Y.

24

687551-7

2006) (claim for breach of fiduciary duty fails, where plaintiff fails to allege any facts showing existence of a fiduciary duty).

Simply put, the Foundation has no role whatsoever in this dispute, and its only alleged connection appears to be that it shares a name with Mr. Brandhorst. All claims against the Foundation should be dismissed.

### Conclusion

For all of the reasons stated herein, and in the accompanying declarations of Udo Fritz-Hermann Brandhorst and Chaya F. Weinberg-Brodt and all the exhibits annexed thereto, the Complaint should be dismissed with prejudice and in the entirety, against all defendants.

Dated: New York, New York
      June 11, 2008

Respectfully submitted,

WITHERS BERGMAN LLP

By: ___/s/ Hollis Gonerka Bart____
    Hollis Gonerka Bart (HB-8955)
    Chaya F. Weinberg-Brodt (CW-4676)
430 Park Avenue
New York, New York 10022
(212) 848-9800
Attorneys for Defendants
Udo Fritz-Hermann Brandhorst and The
Brandhorst Foundation

25