WITHERS BERGMAN LLP
Hollis Gonerka Bart (HB-8955)
Chaya Weinberg-Brodt (CW-4676)
430 Park Avenue, 10th floor
New York, New York 10022
212.848.9800 (p)
212-848-9888 (f)
*Attorneys for Udo Fritz-Hermann Brandhorst and The Brandhorst Foundation*

**REDACTED**

**For Public Filing**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

VENETIA KAPERNEKAS,

               Plaintiff,

           -against-

UDO FRITZ-HERMANN BRANDHORST
and THE BRANDHORST FOUNDATION

              Defendants.
------------------------------------------------------------x

**DECLARATION OF UDO
FRITZ-HERMANN
BRANDHORST IN SUPPORT
OF DEFENDANTS' MOTION
TO DISMISS THE
COMPLAINT**

No. 08-CV-4046 (JSR)

Udo Fritz-Hermann Brandhorst, an individual located outside the United States, makes

this declaration pursuant to 28 U.S.C. § 1746, and states the following under penalty of perjury

under United States law:

      1.     I am an individual defendant in this action, and a founder and the President of

defendant The Brandhorst Foundation, a Bavarian public, not-for-profit foundation (the

"Foundation"), and I make this declaration in support of defendants' motion to dismiss the

Complaint.

      2.     I am 69 years old and a citizen of Germany.

      3.     I have devoted a good part of my life to collecting works of modern art. In or

around 1993, my late wife and I formed the Foundation for the purpose of, among other things,

securing certain art for the benefit of the people of the State of Bavaria.

A.    The Relationship between Ms. Kapernekas and Myself

4.    At some point in the late 1990's, I began a personal relationship with the plaintiff, Venetia Kapernekas.

5.    Thereafter, I began to give money to Ms. Kapernekas to provide her with economic support, even though I was under no obligation to do so.

6.    To accomplish this, in or about December 1998, I set up a trust account in her name at a Swiss bank into which I deposited $900,000 of my own money (the "Account"). I retained power-of-attorney over the Account at all times and remained responsible for the management of the Account.

7.    Specifically, towards the end of each month, I would confer with the bank, and the bank would then send Ms. Kapernekas the interest on the Account, and sometimes a bit more, for her living expenses. Ms. Kapernekas also had a power-of-attorney over the Account and was permitted to have use of the funds in the Account, subject to my management oversight.

8.    On ▮▮▮▮▮▮▮▮, Ms. Kapernekas gave birth to ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ who is my biological daughter. Ms. Kapernekas and I agreed, in writing, that we would share joint custody of ▮▮▮▮▮▮ with Ms. Kapernekas acting as the custodial parent. Annexed hereto as Exhibit A is a true and correct copy of the Declaration of Assumption of Joint Parental Custody dated January 22, 2002, in which we agreed to joint custody of ▮▮▮▮▮▮▮.

9.    At some point after ▮▮▮▮▮▮ was born, I decided to take back what remained of the $900,000 I had originally deposited into the Account, but did so with the understanding that I would make direct monthly payments from myself to Ms. Kapernekas, so that she would still receive an amount equal to the original account deposit of $900,000.

10.    Ms. Kapernekas was in complete agreement with this substitute payment arrangement. In fact, on or about July 1, 2002, Ms. Kapernekas sent written instructions, at my request, instructing the bank to wire transfer the entire remaining balance in the Account (approximately $825,000) to an account in the name of the Gagosian Gallery located in New York City ("Gagosian"). She also instructed the bank to "close my trust account at once." Attached as Exhibit B is a true and correct copy of the wire transfer instructions dated July 1, 2002, together with a certified English translation of these instructions.

11.    While Ms. Kapernakas does not read German, I went through the document and told her exactly what it said before she signed it, even though it is clear on its face that approximately $825,000 USD was being transferred from the Account at the Swiss bank to a Chase account in the United States in the name of Gagosian.

12.    The Account was closed in this manner and the remaining balance transferred to Gagosian because at or about this same time, I had agreed to purchase from Gagosian two works of art by Damien Hirst for a total purchase price of $3,000,000 (the "Works"). For this reason, Ms. Kapernekas specifically asked the bank to let me know the exact amount being transferred to Gagosian, so that I could make arrangements to pay the remaining balance from my personal account to purchase the Works for my personal collection.

13.    Attached hereto as Exhibit C is a true and correct copy of the Gagosian invoice for the Works, which is made out to me alone and which states that title to the Works would pass at the time payment was received in full. As noted in the invoice, payment for the Works was coming from two sources: $825,785 from the Account and the balance of $2,175,000 from my personal account.

14.    Upon receipt of payment, the Works were delivered to me in Germany, where they have remained ever since.

15.    I did not discuss with Ms. Kapernekas anything about the art I purchased, as she had no interest in either of those Works.

16.    I did, however, begin making monthly direct payments to Ms. Kapernekas, as I told her I would. Annexed hereto as Exhibit D is a detailed spreadsheet, contemporaneously prepared by my long-time assistant, Renate Blaffert, detailing every payment that I made to, or on behalf of, Ms. Kapernekas or ▮▮▮▮▮▮ (or her son, who is not my child, Orestes Kapernekas), between June 2002 and today.

17.    Specifically, I sent her $20,000 each month in cash, between September 2002 and March 2008, for a total of $1,240,000. I also gave her the right to use my Visa credit card and I paid in full all of the charges she made on the card issued to her, which during the period August 2002 and January 2007, totaled $457,898. *See* Exhibit D.

18.    Furthermore, I own an apartment on Wooster Street in New York City with an estimated monthly rental of $20,000, in which Ms. Kapernekas and ▮▮▮▮▮▮ reside rent-free, representing an in-kind benefit since November 2001 of approximately $1,600,000.

19.    Finally, I pay many of ▮▮▮▮▮▮ direct expenses, including private school tuition and extra-curricular classes, which has amounted, over the years, to approximately $58,780. Since 2003, I also have voluntarily paid school tuition for Ms. Kapernekas' son from a prior marriage, Orestes Kapernekas, amounting to approximately $76,175. *See* Exhibit D.

20.    In sum, between June 2002 and today, my total payments to Ms. Kapernekas, in cash and in-kind, totaled approximately $3,433,000, which is approximately $2,608,000 more

21.    By or before April 2004, the romantic relationship between Ms. Kapernekas and myself had come to an end.

22.    On April 29, 2004, Ms. Kapernekas filed two proceedings against me in New York Family Court, seeking additional child support and sole physical custody of ███████. I responded to her Petition on June 7, 2004, and she voluntarily withdrew it on October 1, 2004. True and correct copies of these documents are annexed as Exhibits 2 through 5 to the Weinberg-Brodt Declaration.

23.    At no time prior to, during, or immediately after the 2004 proceedings did Ms. Kapernekas raise the subject of the Works I purchased from Gagosian in 2002. Specifically, she did not raise this issue in the Family Court, nor did she include the alleged existence of "her" artwork in her Family Court petitions. Likewise, she did not seek return of the Works she now claims are "hers" – either from myself or from my attorneys, even though she obtained a copy of her wire instructions from the Swiss bank in June 2004 and then faxed a copy of it to my assistant on June 23, 2004 to confirm its contents, explaining that she planned to discuss the matter with her counsel. *See* Ex. B.

24.    Yet, Ms. Kapernekas never made mention of the Works in papers filed in the 2004 proceeding or otherwise until approximately July 2007, when she mentioned, for the first time, that she felt she had a claim to this art. Had I known in 2002 that she believe she had an interest in the Works, I would not have supported her at the generous, and entirely voluntary levels that I did, unless and until I had the opportunity to resolve the issue with her to my satisfaction. However, Ms. Kapernekas said nothing as she continued to accept payments and in-kind benefits from me over the next six years.

25.     In fact, it was only after I commenced a further custody proceeding on January 23, 2008, that Ms. Kapernekas first made demand for the return of "her" art by letter dated January 31, 2008, a true and correct copy of which is attached as Exhibit E; *see also* Weinberg-Brodt Dec. Ex. 6.

26.     Though I had maintained close contact with my daughter in the past, by making frequent trips to New York to visit her and by having ███████ visit me in Europe on numerous occasions, Ms. Kapernerkas cut off my access to my daughter, thereby leaving me with no recourse but to seek an order to restore established and regular access to ███████.

27.     Ms. Kapernekas then filed this suit in April 2008 seeking recovery of art that does not belong to her.

B.     The Foundation

28.     In or around December 1993, my late wife and I established the Brandhorst Foundation. The Foundation is a public, not-for-profit organization established with the approval and under the supervision of the Bavarian government for the purpose of securing significant works of art for the benefit of the Bavarian people and to encourage artistic and scientific advancements in Bavaria. The Foundation's art collection includes the Brandhorst Collection, which holds over 700 significant works of seminal artists of the twentieth century, including Pablo Picasso, Cy Twombly, Andy Warhol, Sigman Polke, Bruce Nauman, Mike Kelley and many others. The Brandhorst Collection was permanently secured for the State of Bavaria in 1999. Attached hereto at Ex. F is a true and correct copy of http://www.museum-brandhorst.de/en/index.html.

29.     The Foundation was established via a donation by my late wife and me to the

Collection"), and certain funds. The Foundation derives no revenue from interstate or

international commerce. Instead, its entire operating budget is derived from principle and

interest income from the initial cash donation my late wife and I gave to fund the work of the

Foundation. The employees of the Foundation are paid by the Foundation out of its budget.

30.    The Foundation has never had any dealings with Ms. Kapernekas whatsoever, in

any country. The Foundation had no dealing with Gagosian with respect to the art at issue in this

lawsuit.

31.    As set forth in greater detail below, the Foundation does not do business in the

United States and has virtually no contacts with this country.

32.    The Foundation has no ownership or other interest in either of the Works that are

at issue in this lawsuit. Instead, title to the Works passed to me on or about July 1, 2002, when I

personally paid for them in full. To this day, I am the sole and exclusive owner of the Works.

33.    To expand upon the Foundation's goals, the State of Bavaria is in the process of

building the Brandhorst Museum (the "Museum") at Munich's Kunstareal, for public display of

the Brandhorst Collection for the people of Bavaria.

34.    The State of Bavaria owns the land on which the Museum is being built and it

has agreed to underwrite the cost of the construction of, and ongoing maintenance for, the

Museum.

35.    The Museum will be owned by the State of Bavaria, and its employees will be

public employees paid by the State of Bavaria. The Foundation has the exclusive right to display

art at the Museum.

36.    I serve as the Foundation's president, and am a member of the board of directors,

C.    The Foundation Lacks Contacts with New York and the United States

37.    The Foundation is a public foundation, formed in Germany, under the laws of Bavaria, Germany, with its only place of business in Germany.

38.    The Foundation maintains no branch, agency, or office in the United States or the State of New York, and has no branch agency, or office organized or licensed under any law of New York or the United States.

39.    The Foundation is not now, and has never qualified, or been licensed, to do business New York or anywhere else in the United States, and the Foundation has never applied for such qualification or license.

40.    The Foundation is not currently, nor has it ever been, registered with the Secretary of State of New York, or with the Secretary of State for any other state in the United States; nor has the Foundation ever applied for authority to do business in the State of New York or in any other state in the United States, precisely because it does not transact business in the State of New York or anywhere else in the United States.

41.    The Foundation does not maintain, and has never maintained, an office in New York State or in the United States.

42.    The Foundation does not maintain, and has never maintained, a telephone listing or mailing address in New York State or in the United States.

43.    Apart from the legal counsel it retained to make the instant motion to dismiss it from this case, the Foundation does not have any employees or agents residing in New York State or in the United States, nor does it solicit business in New York State or in the United States.

44.    The Foundation has never owned, leased, or possessed any interest whatsoever in any assets in New York State, or in the United States, including real or personal property.

45.    The Foundation has never engaged in any advertising for its products and services calculated to reach New York State or the United States.

46.    The Foundation does not sell or market, and has not ever sold or marketed, any product or service in New York State or in the United States.

47.    The Foundation does not derive, and has not ever derived, any revenue from the sale of any product or service to be used or consumed in New York State or in the United States. Indeed, the Foundation derives no revenue from interstate or international commerce at all, because all of its revenue originates with the financial grant that my late wife and I donated to it and from the State of Bavaria, which is funding from public funds the cost to build and maintain the Museum.

48.    The Foundation does not, and has not ever, paid taxes in or to New York State or in or to any taxing authority in the United States.

49.    The Foundation does not maintain any bank accounts or correspondent bank accounts in New York State or in the United States.

50.    The Foundation has not consented to the exercise of jurisdiction over it by the courts of New York State or the United States, nor has the Foundation ever appointed or authorized any agent to accept process for it in New York State or the United States.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct. Executed on June, __, 2008.

Dated: Bavaria, Germany
    June *10* 2008

_____
Udo Fritz-Hermann Brandhorst

10

691509.

# EXHIBIT A

# EXCISED FROM PUBLIC

# FILING

# Exhibit B
# to
# Brandhorst Declaration

**Venetia Kapernekas**

104 Wooster Street, 3N
New York, N.Y. 10012
U.S.A.

Basler Kantonalbank
Bereich Privatkunden
z. H. Herrn Willi Harr
Postfach
CH - 4002 Basel


1. Juli 2002


Treuhandanlage
Stand per 31.05.2002: 825.416,83 US-$


Sehr geehrter Herr Harr,                                 *DEN GESAMTEN*
                                                         *DOLLAR BETRAG*

Ich bitte Sie um sofortige Schließung meiner Treuhandanlage. Bitte überweisen Sie
das Guthaben wie folgt:

Empfänger:       Gagosian Gallery
                 980 Madison Avenue
                 New York, NY 10021 / USA

Bankverbindung:  Chase Bank
                 475 West 23rd Street
                 New York, NY 10011 / USA
                 ABA # ████████████
                 Account Name: Gagosian Gallery, Inc.
                 Account Number ███████████

Betreff:         Invoice 02252

Bitte geben Sie vorab

                 Herrn Udo Brandhorst, Haydnstr. 15, D- 50935 Köln
                 Fax: (+49) 221 - 467 1112

den genauen Betrag bekannt, der zur Auszahlung gelangt.


Mit freundlichen Grüßen

*[signature]*
Venetia Kapernekas

**Venetia Kapernekas**
104 Wooster Street, 3N
New York, NY 10012
U.S.A.

Basler Kantonalbank
Area Private Clients
Attn: Mr. Willi Harr
P.O. Box
CH-4002 Basel

July 1, 2002

**Trust Account**
**Status as of 5/31/2002: $825,416.83 US**

Dear Mr. Harr,

Please close my trust account at once. Please transfer[1] the balance as follows:

Recipient:          Gagosian Gallery
                    980 Madison Avenue
                    New York, NY 10021 / USA

Bank Connection:    Chase Bank[2]
                    475 West 23rd Street
                    New York, NY 10011 / USA
                    ABA ▓▓▓▓
                    Account Name: Gagosian Gallery, Inc.
                    Account Number: ▓▓▓▓▓▓

Re:                 Invoice 02252

Please initially apprise

                    Mr. Udo Brandhorst, Haydnstr. 15, D-50935 Cologne
                    Fax: (+49) 221 - 467 - 1112

of the precise amount that is paid.

With kind regards
[SIGNATURE]
Venetia Kapernekas

---

[1] [Above "transfer" hand-written notation] *the entire dollar amount*
[2] [Stamp placed over bank information illegible]



**LEGAL LANGUAGE SERVICES**

An affiliate of ALS International
18 John Street
Suite 300
New York, NY 10038

Telephone  (212) 766-4111
Toll Free    (800) 788-0450
Telefax     (212) 349-0964
www.legallanguage.com

June 10, 2008

To whom it may concern:

This is to certify that the attached translation from German into English is an accurate representation of the document received by this office. This document is designated as:

*Investment Documents*

George Alves, Manager of Translation Services of this company, certifies that Andrew Dyck, who translated this document, is fluent in German and standard North American English and is qualified to translate.

He attests to the following:

"To the best of my knowledge, the accompanying text is a true, full and accurate translation of the specified document."

Signature of George Alves

Subscribed and sworn to before me this 10th day of June, 2008

Rosemary Diaz
Notary Public, State of New York
No. 01DI6077317
Certificate filed in New York County
Qualified in Kings County
Commission Expires July 8, 2010

Sincerely,

Victor J. Hertz
President & CEO

# Exhibit C
# to
# Brandhorst Declaration

# GAGOSIAN GALLERY

May 7, 2002                          Invoice 02252
                                     Revised

Mr Udo Brandhorst
Haydnstrasse 15
50935 Koln-Lindenthal
GERMANY

INVOICE

DAMIEN HIRST
*Hymn*, 2000
Painted Bronze
240 x 108 x 48 inches (609.6 x 274.3 x 121.9 cm)

DAMIEN HIRST
*(Untitled)* Pill Cabinet, 2002
Mixed media
27 x 8 feet (8.2 x 2.4 meter)

TOTAL AMOUNT DUE:              $3,000,000.00
                              ============

Wire information: Chase Bank
                  475 West 23rd Street
                  New York, NY 10011
                  ABA #
                  Account Name: Gagosian Gallery, Inc.
                  Account Number:

*Title does not pass until payment in full has been received.*

Überweisung durch Herrn Zimmer veranlaßt: 12.06.02        2,175.000,-- $
Basler Kantonalbank:                                        825.785,-- $

980 MADISON AVENUE  NEW YORK  NY  10021  T. 212.744.2313  F. 212.772.7962
INFO@GAGOSIAN.COM  WWW.GAGOSIAN.COM

Exhibit D
to
Brandhorst Declaration

# Expenses

<u>Venetia Kapernekas</u>

Monthly payments:
September 2002 – March 2008                    1,240,000.00 $

<u>Visa Credit Card:</u>
August 2002 – January 2007:    297,282.02 Euro        457,898.00 $

<u>Wooster Street 3N: Rent</u>
(20,000 $ per month)
November 2001 – March 2008                    <u>1,540,000.00 $</u>

                                               <u>3,237,898.00 $</u>

<u>Additional expenses:</u>

████████████                                   58,780.67 $

Orestes                                        74,390.52 $
                                               1,130.00 €

All spreadsheets are enclosed.

1

## Venetia Kapernekas: Monthly Payments

| Check # | Month | $-Amount |
|---------|-------|----------|
| 283 | 09/2002 | 20,000.00 |
| 287 | 10/2002 | 20,000.00 |
| 294 | 11/2002 | 20,000.00 |
| 297 | 01/2003 | 20,000.00 |
| 303 | 02/2003 | 25,000.00 |
| 306 | 03/2003 | 20,000.00 |
| 314 | 05/2003 | 15,000.00 |
| 327 | 08/2003 | 20,000.00 |
| 334 | 10/2003 | 20,000.00 |
| 350 | 12/2003 | 20,000.00 |
| 351 | 02/2004 | 40,000.00 |
| 355 | 03/2004 | 20,000.00 |
| 356 | 03/2004 | 20,000.00 |
| 360 | 04/2004 | 20,000.00 |
| 364 | 05/2004 | 20,000.00 |
| 377 | 06/2004 | 20,000.00 |
| 383 | 07/2004 | 20,000.00 |
| 389 | 09/2004 | 20,000.00 |
| 390 | 09/2004 | 20,000.00 |
| 396 | 10/2004 | 20,000.00 |
| '401 | 11/2004 | 20,000.00 |
| 410 | 01/2005 | 20,000.00 |
| 412 | 01/2005 | 20,000.00 |
| 416 | 02/2005 | 20,000.00 |
| 420 | 03/2005 | 20,000.00 |
| 423 | 04/2005 | 20,000.00 |
| 427 | 05/2005 | 20,000.00 |
| 430 | 06/2005 | 20,000.00 |
| 440 | 07/2005 | 20,000.00 |
| 446 | 09/2005 | 20,000.00 |
| 450 | 09/2005 | 20,000.00 |
| 453 | 10/2005 | 20,000.00 |
| Standing order: | 11/2005 | 20,000.00 |
| | 12/2005 | 20,000.00 |
| | 01/2006 | 20,000.00 |
| | 02/2006 | 20,000.00 |
| | 03/2006 | 20,000.00 |
| | 04/2006 | 20,000.00 |
| | 05/2006 | 20,000.00 |
| | 06/2006 | 20,000.00 |

|  | 07/2006 | 20,000.00 |
|---|---|---|
|  | 08/2006 | 20,000.00 |
|  | 09/2006 | 20,000.00 |
|  | 10/2006 | 20,000.00 |
|  | 11/2006 | 20,000.00 |
|  | 12/2006 | 20,000.00 |
|  | 01/2007 | 20,000.00 |
|  | 02/2007 | 20,000.00 |
|  | 03/2007 | 20,000.00 |
|  | 04/2007 | 20,000.00 |
|  | 05/2007 | 20,000.00 |
| Check #556 | 06/2007 | 20,000.00 |
| Standing order: | 07/2007 | 20,000.00 |
|  | 08/2007 | 20,000.00 |
|  | 09/2007 | 20,000.00 |
|  | 10/2007 | 20,000.00 |
|  | 11/2007 | 20,000.00 |
|  | 12/2007 | 20,000.00 |
| Check #611 | 01/2008 | 20,000.00 |
| Standing order: | 02/2008 | 20,000.00 |
|  | 03/2008 | 20,000.00 |
| Total in USD |  | 1,240,000.00 |

1

Venetia Kapernekas: VISA Credit Card

| Month of Statement: | Euro: |
|---|---|
| 08/2002 | 3,248.91 |
| 10/2002 | 3,632.81 |
| 11/2002 | 2,381.29 |
| 12/2002 | 2,218.54 |
| 01/2003 | 7,225.29 |
| 02/2003 | 5,440.19 |
| 03/2003 | 1,066.03 |
| 04/2003 | 1,402.19 |
| 05/2003 | 1,723.86 |
| 06/2003 | 2,220.08 |
| 07/2003 | 4,024.82 |
| 08/2003 | 11,553.05 |
| 09/2003 | 1,623.05 |
| 10/2003 | 2,308.68 |
| 11/2003 | 3,031.36 |
| 12/2003 | 12,303.51 |
| 01/2004 | 3,820.80 |
| 02/2004 | 2,250.87 |
| 03/2004 | 2,155.05 |
| 04/2004 | 12,344.17 |
| 05/2004 | 6,247.50 |
| 06/2004 | 4,686.96 |
| 07/2004 | 11,187.41 |
| 08/2004 | 7,878.11 |
| 09/2004 | 3,287.74 |
| 10/2004 | 23,533.62 |
| 11/2004 | 2,055.64 |
| 12/2004 | 9,135.54 |
| 01/2005 | 2,016.16 |
| 02/2005 | 7,644.15 |
| 03/2005 | 3,804.42 |
| 04/2005 | 9,655.51 |
| 05/2005 | 4,109.55 |
| 06/2005 | 1,321.81 |
| 07/2005 | 6,123.33 |
| 08/2005 | 8,361.36 |
| 09/2005 | 3,088.38 |
| 10/2005 | 19,173.50 |
| 11/2005 | 5,652.05 |
| 12/2005 | 1,881.77 |

2

| | |
|---|---|
| 01/2006 | 2,027.16 |
| 02/2006 | 3,069.03 |
| 03/2006 | 4,235.91 |
| 04/2006 | 4,187.82 |
| 05/2006 | 8,134.86 |
| 06/2006 | 3,700.37 |
| 07/2006 | 8,890.07 |
| 08/2006 | 11,726.52 |
| 09/2006 | 10,695.63 |
| 10/2006 | 1,167.99 |
| 11/2006 | 9,813.56 |
| 12/2006 | 1,074.88 |
| 01/2007 | 1,739.16 |
| Total in Euro: | 297,282.02 |
| = in USD: | 457,898.00 |



## The Washington Market School

| Check # | Month | $-Amount |
|---------|---------|-----------|
| 328 | 09/2003 | 1,050.00 |
| 336 | 11/2003 | 1,050.00 |
| 339 | 12/2003 | 2,520.00 |
| 377 | 06/2004 | 1,175.00 |
| 367 | 05/2004 | 2,000.00 |
| 378 | 06/2004 | 2,100.00 |
| 386 | 08/2004 | 2,100.00 |
| 393 | 09/2004 | 2,100.00 |
| 404 | 11/2004 | 2,100.00 |
| 415 | 02/2005 | 2,000.00 |
| 438 | 06/2005 | 1,300.00 |
| 431 | 05/2005 | 3,325.00 |
| 439 | 07/2005 | 3,325.00 |
| 448 | 09/2005 | 3,325.00 |
| 459 | 11/2005 | 3,325.00 |
| 526 | 10/2006 | 14,100.00 |

## LREI

| | | |
|---------|---------|-----------|
| 625 | 03/2008 | 2,830.00 |
| 636 | 05/2008 | 8,725.67 |

## German School

| | | |
|---------|---------|-----------|
| 625 | 03/2008 | 330.00 |

Total Amount:                58,780.67

**ORESTES**  (Venetia's son)

The Dwight School

| Check # | Month | $-Amount |
|---------|---------|-----------|
| 325 | 09/2003 | 5,357.50 |
| 326 | 09/2003 | 2,377.50 |
| 331 | 10/2003 | 2,377.50 |
| 335 | 11/2003 | 2,377.50 |
| 346 | 01/2004 | 6,377.50 |
| 348 | 02/2004 | 2,377.50 |
| 379 | 06/2004 | 14,620.00 |
| 400 | 11/2004 | 7,530.00 |

University of Colorado

| 444 | 08/2005 | 15,552.76 |
| 468 | 01/2006 | 15,442.76 |

Total amount:                74,390.52

Sailing school                1,130.00 €

# Exhibit E
# to
# Brandhorst Declaration



**Fox Rothschild** LLP
ATTORNEYS AT LAW

2700 Kelly Road, Suite 300
Warrington, PA 18976-3624
Tel 215.345.7500  Fax 215.345.7507
www.foxrothschild.com

Robert E. Goldman
Direct Dial: (215) 918-3550
Email Address: rgoldman@foxrothschild.com

January 31, 2008

**VIA FEDERAL EXPRESS**
Sheila Riesel, Esq.
Blank Rome
405 Lexington Avenue
The Chrysler Building
New York, NY  10174

Re:    Udo Brandhorst and the Brandhorst Collection

Dear Ms. Riesel:

It is my understanding that you represent Udo Brandhorst in relation to Family Law matters involving Venetia Kapernekas.  I am therefore sending this letter to you and request that it be forwarded on to Mr. Brandhorst for his review.

This office has been retained by Venetia Kapernekas to recover a significant piece of art presently believed to be in the Brandhorst Collection.  The artwork was purchased by Mr. Brandhorst with funds supplied by my client.  Given the sensitivity of this matter and our desire not to diminish the value of the art, the identity of the piece will not be discussed in this letter.  Certainly, Mr. Brandhorst and others are in the position to identify it to you.  In addition, bank records of Ms. Kapernekas and records of Gagossian Gallery further identify the subject piece.  Should further proof be necessary, the testimony of Mr. Gagossian and other gallery employees would identify the artwork.

I am requesting at this time that a meeting be arranged with Mr. Brandhorst to discuss a resolution of Ms. Kapernekas' claim.  Given the sensitive nature of the underlying facts and our desire to resolve this matter away from public scrutiny, I believe it is in all of our best interests to promptly schedule a meeting.  It is my firm belief that a resolution of this claim may be accomplished in a professional manner with the end result protecting the interests of all.

Given the importance of resolving this claim, I will make myself available to meet with Mr. Brandhorst promptly at a location convenient to him.  May I suggest that a meeting in New York be arranged.  If Mr. Brandhorst's schedule does not permit this, a different site may be selected.

A Pennsylvania Limited Liability Partnership

California        Delaware        Florida        Nevada        New Jersey        New York        Pennsylvania



**Fox Rothschild** LLP
ATTORNEYS AT LAW

Page 2

Pending a discussion of this matter in person, I am respectfully requesting that Ms. Kapernekas not be contacted by Mr. Brandhorst or others to discuss <u>this</u> particular matter and that no retaliatory action be taken against her. I further request that no disposition of the artwork take place that is adverse to the ownership interest of my client. Simply stated, it is her wish, and our expectation, that this potential dispute be concluded in a professional, prompt and just manner.

I look forward to hearing from you soon to schedule a meeting.

Respectfully,

Robert E. Goldman

REG/jsn

cc: Venetia Kapernekas

# Exhibit F
## to
# Brandhorst Declaration

# MUSEUM BRANDHORST

Brandhorst Foundation

The Udo and Anette Brandhorst Collection holds over 700 significant works of seminal artists of the twentieth century. Pablo Picasso, Cy Twombly, Andy Warhol, Sigmar Polke, Bruce Nauman, Mike Kelley and many others are represented with exemplary bodies of works that represent important markers in the development of modernism.

The Brandhorst Collection, part of the Brandhorst Foudation, was permanently secured for the Bavarian State in 1999.
As a significant addition to Munich's Kunstareal the Brandhorst Foundation presents a potential for local cultural development with far reaching reverberations. With the financial support of the foundation, the Brandhorst Collection will be continually developed. Beyond this, the presence of the Brandhorst Foundation in Munich enables a great number of artistic and scientific advancements.



Brandhorst Museum          Brandhorst Collection          Architecture          Site Map          Contact          Press
Brandhorst Foundation
Museum Brandhorst in the Kunstareal